# ARIZONA *v.* MANYPENNY

No. 79–621.   Argued November 10, 1980—Decided April 21, 1981

BLACKMUN, J., delivered the opinion of the Court, in which BURGER, C. J., and STEWART, WHITE, POWELL, REHNQUIST, and STEVENS, JJ., joined. STEVENS, J., filed a concurring opinion, *post*, p. 250. BRENNAN, J., filed a dissenting opinion, in which MARSHALL, J., joined, *post*, p. 251.

*Daniel Jesse Smith* argued the cause for petitioner. With him on the briefs was *Stephen D. Neely.*

*James D. Whitney* argued the cause and filed a brief for respondent.*

JUSTICE BLACKMUN delivered the opinion of the Court.

Respondent, a federal officer, was charged in Arizona with the commission of a state crime. On the officer's motion, the case was removed from state court and tried in federal court. The issue presented is whether a federal appellate court has jurisdiction to entertain Arizona's appeal from the District Court's judgment of acquittal entered after a jury verdict of guilty.

---

*Solicitor General McCree* and *Assistant Attorney General Heymann* filed a brief for the United States as *amicus curiae* urging reversal.

# I

## A

Respondent William Dale Manypenny had been employed for six years as a Border Patrol Agent in the United States Immigration and Naturalization Service (INS). On the moonlit evening of March 15, 1976, he and fellow Agent Gerald Wayne Hjelle were assigned to patrol the Sweetwater Pass, located on federal land in Pima County, Ariz., approximately 10 miles from the Mexican border.[1] INS officials knew that the Pass was frequently traveled by aliens illegally entering the United States. While patrolling the Pass, respondent and his colleague were expected to stop and question any person suspected of being an alien and to arrest that person if he could not produce a lawful entry permit.[2] Both agents wore plain clothes, as was customary for patrol work in that rugged desert area. Tr. 248–249, 293.

Three Mexican males were traveling north along the trail when respondent's electronic sensor system signaled their approach.[3] Following standard procedure, Agent Hjelle stationed himself near where the path emerged from the canyon onto higher ground. Respondent took a position some 100 yards to the south, on a bluff overlooking but out of sight of the path. The plan called for Hjelle to stop any suspected illegal alien, identify himself, and conduct a brief inquiry to determine the suspect's status, while respondent approached from behind.

---

[1] Sweetwater Pass is located about 29 miles southeast of Ajo, Ariz. The Pass is bounded on the west by the Organ Pipe Cactus National Monument, and on the east by the Papago Indian Reservation. It is undisputed that the events in question occurred on land owned by the Federal Government.

[2] Under 8 U. S. C. § 1325, an alien not previously convicted of illegal entry who enters the United States at an improper time or place is guilty of a misdemeanor.

[3] According to testimony at trial, the Mexicans were unarmed and were seeking employment in this country. Tr. 15, 23.

The three men emerged from the canyon and saw Hjelle, who ordered them to stop. *Id.*, at 16–17, 283–284. Before Hjelle could begin his questioning, one of the men turned and ran back south toward the border. Respondent shouted after him to halt. *Id.*, at 174. When the fleeing man failed to stop, respondent fired three shotgun blasts in his direction. One hit the fugitive in the buttocks, causing multiple wounds. *Id.*, at 105–106. Another struck him in the upper spine, severing the cord and leaving him a quadriplegic. *Id.*, at 87–88, 93.

## B

Respondent was indicted in the Superior Court of Pima County, Ariz., for assault with a deadly weapon, in violation of Ariz. Rev. Stat. Ann. §§ 13–249 A and B (Supp. 1973).[4] Because the charge arose from an act committed while on duty for the INS, respondent, pursuant to 28 U. S. C. § 1442 (a)(1),[5] removed the case to the United States District Court

---

[4] The statute then read in pertinent part:

"A. A person who commits assault upon the person of another with a deadly weapon or instrument . . . shall be punished by imprisonment in the state prison for not less than one nor more than ten years, by a fine not exceeding five thousand dollars, or both.

"B. A crime as prescribed by the terms of subsection A, committed by a person armed with a gun or other deadly weapon, is punishable by imprisonment in the state prison, for the first offense, for not less than five years . . . and in no case . . . shall the person convicted be eligible for suspension or commutation of sentence, probation, pardon or parole until such person has served the minimum sentence imposed."

Section 13–249 was repealed by 1977 Ariz. Sess. Laws, ch. 142, § 4, effective Oct. 1, 1978, and replaced by other legislation. See Ariz. Rev. Stat. Ann. § 13–1204 (1978).

[5] Title 28 U. S. C. § 1442 (a)(1) provides: ·

"(a) A civil action or criminal prosecution commenced in a State court against any one of the following persons may be removed by them to the district court of the United States for the district and division embracing the place wherein it is pending:

"(1) Any officer of the United States or any agency thereof, or person acting under him, for any act under color of such office or on account of

for the District of Arizona. The case was tried before a jury, and a verdict of guilty was returned. Respondent then timely moved for arrest of judgment or, alternatively, for a new trial. See Fed. Rules Crim. Proc. 33 and 34.[6] The District Court granted respondent's motion to arrest judgment and dismissed the indictment; it did so on the ground that the State could not assert its criminal jurisdiction over federal lands. 7 Record 7–8. The State immediately moved for reconsideration; the District Court also granted the State's motion and took the matter under advisement. App. 36–38.

Nine months later, the District Court vacated its previous order arresting judgment. 445 F. Supp. 1123 (1977). The court on reconsideration held that Arizona retained criminal jurisdiction over all land within its exterior boundaries.[7] Having determined that it properly could exercise jurisdiction over Arizona's claim, the District Court then proceeded *sua sponte* to construe respondent's motion under Rule 34 as a motion for judgment of acquittal, pursuant to Federal Rule of Criminal Procedure 29 (c). Although an immunity defense had not been raised at trial, and the State had not introduced any evidence designed to overcome that defense, the court concluded that it had erred in failing to instruct the jury on such a defense. Relying on principles enunciated in *In re Neagle,* 135 U. S. 1, 75 (1890), and *Clifton* v. *Cox,* 549 F. 2d 722 (CA9 1977), the District Court reasoned that re-

---

any right, title or authority claimed under any Act of Congress for the apprehension or punishment of criminals or the collection of the revenue."

[6] In his motion in arrest of judgment under Rule 34, respondent maintained that the State of Arizona, and therefore the United States District Court on removal, had no criminal jurisdiction over the federal land where the shooting occurred. Respondent further contended that any attempt to prosecute him under a state statute unlawfully interfered with the exclusively federal interest in regulating·immigration.

[7] The court further concluded that the federal interest in enforcement of the immigration laws did not pre-empt the applicability of state criminal law in this instance. 445 F. Supp., at 1125–1127.

spondent would be immune from prosecution on a state criminal charge if he acted under color of federal law and in the honest belief that his actions were necessary and proper for the execution of his federal duties. 445 F. Supp., at 1126–1127. The court applied this standard to the evidence adduced at trial, and concluded that a reasonable jury could not have found respondent guilty beyond a reasonable doubt. *Id.*, at 1128. The presumed motion for acquittal was granted and the jury verdict was set aside.

Claiming that the trial court had exceeded its authority,[8] the State filed a timely notice of appeal from the acquittal. It invoked the appellate court's jurisdiction under 18 U. S. C. § 3731.[9] The United States Court of Appeals for the Ninth Circuit, by a brief *per curiam* opinion citing *Sanabria* v. *United States,* 437 U. S. 54 (1978), initially dismissed the appeal on double jeopardy grounds.[10] Upon timely petition for rehearing, however, the Court of Appeals withdrew the opinion, App. to Pet. for Cert. 1a, and substituted another in its place. This time, by a divided vote, the court dismissed Arizona's appeal on the ground that jurisdiction was lacking.

---

[8] Arizona argued that the District Court lacked jurisdiction to act on a Rule 29 (c) motion 11 months after a guilty verdict, in violation of the Rule's 7-day requirement. Brief for Appellant in No. 77–3453 (CA9), pp. 8–11. The State also contended that the District Court had misapplied relevant immunity law and that the evidence was more than sufficient to sustain the jury verdict. *Id.*, at 17–24.

[9] Section 3731 provides in pertinent part:

"In a criminal case an appeal by the United States shall lie to a court of appeals from a decision, judgment, or order of a district court dismissing an indictment or information as to any one or more counts, except that no appeal shall lie where the double jeopardy clause of the United States Constitution prohibits further prosecution."

[10] The court reasoned that even if, in a removed criminal prosecution, the State of Arizona had the same right of appeal under 18 U. S. C. § 3731 as is accorded the United States in a federal prosecution, the judgment of acquittal nonetheless was unreviewable on double jeopardy grounds. App. to Pet. for Cert. 39a–40a.

608 F. 2d 1197 (1979). It noted that under settled precedent of this Court, the Government may take an appeal from an adverse decision in a criminal case only if expressly authorized by statute to do so. *United States* v. *Martin Linen Supply Co.*, 430 U. S. 564, 568 (1977); *United States* v. *Wilson*, 420 U. S. 332, 336 (1975); *United States* v. *Sanges*, 144 U. S. 310, 312, 318–323 (1892). Emphasizing the language of 18 U. S. C. § 3731, the court held that the statute authorizes an appeal only when the *United States* is the prosecutor, not when a state prosecution has been removed to federal court.

The Court of Appeals declined to consider whether state law provided Arizona with a right to appeal in this case. Instead, the court reasoned that a criminal proceeding removed to federal court under 28 U. S. C. § 1442 (a)(1) arises under federal law, and accordingly is to be controlled by that law rather than state law. The court concluded that "only Congress can authorize an appeal by a state in a § 1442 (a)(1) criminal prosecution," and Congress had not done so. 608 F. 2d, at 1200. The Court of Appeals also rejected the suggestion that the general appeals statute, 28 U. S. C. § 1291,[11] provided authorization for Arizona's appeal. 608 F. 2d, at 1199, n. 3.

The dissenting judge discerned separate bases for appellate jurisdiction in 18 U. S. C. § 3731 and 28 U. S. C. § 1291. 608 F. 2d, at 1200–1202.[12]

---

[11] Title 28 U. S. C. § 1291 provides:

"The courts of appeals shall have jurisdiction of appeals from all final decisions of the district courts of the United States, the United States District Court for the District of the Canal Zone, the District Court of Guam, and the District Court of the Virgin Islands, except where a direct review may be had in the Supreme Court."

[12] Having found jurisdiction, the dissent concluded on the merits that the judgment of acquittal should be reversed. 608 F. 2d, at 1205. The Court of Appeals' majority, however, did not reach the merits. In view of the posture of the case, we also intimate no view on the merits. Neither do we have any occasion now to decide whether the instant appeal would be barred under the Double Jeopardy Clause of the Fifth Amendment,

We granted certiorari in order to resolve a problem of appellate jurisdiction created by the federal removal statute. 445 U. S. 960 (1980). Because it is an issue that carries significance for federal-state relations, we pay close attention to both state and federal law bearing on its resolution.

## II

We begin by noting that had respondent's trial occurred in state rather than federal court, Arizona's statutes, as construed and applied by the courts of that State, would enable the State to obtain the appellate review it seeks. Under Arizona law, the prosecution is authorized to seek review, by certiorari, when its claim is that the lower court has exceeded its jurisdiction or has abused its discretion. See Ariz. Rev. Stat. Ann. § 12–2001 (1956).[13] The State's petition for re-

which is enforceable against the States through the Fourteenth Amendment. *Benton* v. *Maryland,* 395 U. S. 784, 793–796 (1969). That question was not decided by the Court of Appeals, and the parties have not raised it before this Court. See Tr. of Oral Arg. 33.

[13] Section 12–2001 reads:

"The writ of certiorari may be granted by the supreme and superior courts or by any judge thereof, in all cases when an inferior tribunal, board or officer, exercising judicial functions, has exceeded its jurisdiction and there is no appeal, nor, in the judgment of the court, a plain, speedy and adequate remedy."

A writ of certiorari may be obtained by filing a petition for special action, pursuant to Rule 4, Rules of Procedure for Special Actions, vol. 17A, Ariz. Rev. Stat. Ann. (1973). The certiorari provision itself speaks of review to determine whether the lower court has exceeded its jurisdiction, but as consistently construed by the Arizona Supreme Court, the statute also authorizes review for abuse of discretion. *State ex rel. Hyder* v. *Superior Court (Clifton, Real Party in Interest),* 128 Ariz. 216, 222, 624 P. 2d 1264, 1270 (1981); *State ex rel. Dawson* v. *Superior Court,* 112 Ariz. 123, 538 P. 2d 397 (1975); *State ex rel. Ronan* v. *Superior Court,* 95 Ariz. 319, 322, 390 P. 2d 109, 111 (1964); *State ex rel. Mahoney* v. *Stevens,* 79 Ariz. 298, 300, 288 P. 2d 1077, 1078 (1955). See Rule 3, Rules of Procedure for Special Actions, vol. 17A, Ariz. Rev. Stat. Ann. (1973).

view has been routinely granted in numerous instances exactly like this case, where the prosecution seeks review of a judgment of acquittal following a guilty verdict. See, *e. g., State ex rel. Hyder* v. *Superior Court* (*Clifton, Real Party in Interest*), 128 Ariz. 216, 624 P. 2d 1264 (1981); *State ex rel. Hyder* v. *Superior Court* (*Moya, Real Party in Interest*), 124 Ariz. 560, 606 P. 2d 411 (1980); *State ex rel. Dawson* v. *Superior Court,* 112 Ariz. 123, 538 P. 2d 397 (1975). See also *State* v. *Allen,* 27 Ariz. App. 577, 557 P. 2d 176 (1976); *State* v. *Lopez,* 26 Ariz. App. 559, 550 P. 2d 113 (1976); *State* v. *Gradillas,* 25 Ariz. App. 510, 512, 544 P. 2d 1111, 1113 (1976).[14]

Thus, the sole question posed here is whether respondent's removal of the state prosecution to federal court for trial alters the nature of the State's otherwise well-established right, under state law, to seek review of the instant judgment of acquittal. We consider this question first by reviewing the legal effect of and the policies served by removal for trial under § 1442 (a)(1). We then examine respondent's argument that the federal law governing federal appellate jurisdiction not only does not permit but also, in fact, bars the State's criminal appeal in federal court.

---

[14] The dissent maintains that this longstanding application of the statute, never questioned by the Arizona Legislature, is an insufficiently clear expression of state law. But it is obvious that in the precise circumstances of this case, the Arizona Legislature and the Arizona Supreme Court have authorized the appellate review requested by the State. The absence of a statutory formula providing for automatic appeal by the State in *every* criminal prosecution does not alter this fact.

A separate Arizona statute permits the State to appeal from an "order made after judgment affecting the substantial rights of the state." Ariz. Rev. Stat. Ann. § 13–4032.5 (1978), formerly § 13–1712.5. Although there is little case law interpreting this provision, it may furnish an additional basis for appellate review here. See generally *State ex rel. Hyder* v. *Superior Court* (*Clifton, Real Party in Interest*), 128 Ariz., at 220, 624 P. 2d, at 1268; *State* v. *Wynn,* 114 Ariz. 561, 563, 562 P. 2d 734, 736 (App. 1977).

## A

The Court of Appeals concluded that the fact of removal substantially alters the State's right to seek review. Reasoning that a case brought pursuant to § 1442 (a)(1) arises under federal law, the court held that state enabling statutes retain no significance. But a state criminal proceeding against a federal officer that is removed to federal court does not "arise under federal law" in this pre-empting sense. Rather, the federal court conducts the trial under federal rules of procedure while applying the criminal law of the State. *Tennessee* v. *Davis,* 100 U. S. 257, 271–272 (1880). See Fed. Rule Crim. Proc. 54 (b)(1), Advisory Committee Notes, 18 U. S. C. App., pp. 1480–1481.[15]

This principle is entirely consistent with the purpose underlying the removal of proceedings commenced in state court against a federal officer. Historically, removal under § 1442 (a)(1) and its predecessor statutes was meant to ensure a federal forum in any case where a federal official is entitled to raise a defense arising out of his official duties.[16] The act

---

[15] In concluding that federal law controls all aspects of a case before the federal court under § 1442 (a)(1), the Court of Appeals relied on several decisions, none of which involved proceedings removed from state to federal court. See *D'Oench, Duhme & Co.* v. *Federal Deposit Ins. Corp.,* 315 U. S. 447 (1942); *Deitrick* v. *Greaney,* 309 U. S. 190 (1940); *Board of Comm'rs* v. *United States,* 308 U. S. 343 (1939); *United States* v. *Crain,* 589 F. 2d 996 (CA9 1979). Moreover, in each of these cases federal law was deemed controlling because the rights that the complainant sought to protect or enforce were created by federal statutes. In contrast, petitioner here seeks to enforce a state statute.

[16] This Court elsewhere has reviewed the "long history" of the federal-officer removal statute. *Willingham* v. *Morgan,* 395 U. S. 402, 405–406 (1969). It has been 100 years since the Court in *Tennessee* v. *Davis,* 100 U. S. 257 (1880), first emphasized the need to safeguard the exercise of legitimate federal authority:

"[The Federal Government] can act only through its officers and agents, and they must act within the States. If, when thus acting, and within the scope of their authority, those officers can be arrested and brought

of removal permits a trial upon the merits of the state-law question free from local interests or prejudice. See *Colorado v. Symes,* 286 U. S. 510, 517–518 (1932); *Maryland v. Soper,* 270 U. S. 9, 32 (1926). It also enables the defendant to have the validity of his immunity defense adjudicated in a federal forum. *Willingham v. Morgan,* 395 U. S. 402, 407 (1969). For these reasons, this Court has held that the right of removal is absolute for conduct performed under color of federal office, and has insisted that the policy favoring removal "should not be frustrated by a narrow, grudging interpretation of § 1442 (a)(1)." *Ibid.*

At the same time, the invocation of removal jurisdiction by a federal officer does not revise or alter the underlying law to be applied. In this respect, it is a purely derivative form of jurisdiction, neither enlarging nor contracting the rights of the parties.[17] Federal involvement is necessary in order to insure a federal forum, but it is limited to assuring that an impartial setting is provided in which the federal defense of immunity can be considered during prosecution under state law. Thus, while giving full effect to the purpose of re-

to trial in a State court, for an alleged offense against the law of the State, yet warranted by the Federal authority they possess, and if the general government is powerless to interfere at once for their protection,—if their protection must be left to the action of the State court,—the operations of the general government may at any time be arrested at the will of one of its members." *Id.,* at 263.

[17] In the area of general civil removals, it is well settled that if the state court lacks jurisdiction over the subject matter or the parties, the federal court acquires none upon removal, even though the federal court would have had jurisdiction if the suit had originated there. *Freeman v. Bee Machine Co.,* 319 U. S. 448, 449 (1943); *Minnesota v. United States,* 305 U. S. 382, 389 (1939); *Lambert Run Coal Co. v. Baltimore & Ohio R. Co.,* 258 U. S. 377, 382 (1922). This principle of derivative jurisdiction is instructive where, as here, relevant state-court jurisdiction is found to exist and the question is whether the federal court in effect loses such jurisdiction as a result of removal. Of course, because appellate rather than original jurisdiction is at issue, the analogy is not perfect. See Subpart B, *infra.*

moval, this Court retains the highest regard for a State's right to make and enforce its own criminal laws. *Colorado* v. *Symes,* 286 U. S., at 517–518.

Under our federal system, "[i]t goes without saying that preventing and dealing with crime is much more the business of the States than it is of the Federal Government." *Patterson* v. *New York,* 432 U. S. 197, 201 (1977). Because the regulation of crime is pre-eminently a matter for the States, we have identified "a strong judicial policy against federal interference with state criminal proceedings." *Huffman* v. *Pursue, Ltd.,* 420 U. S. 592, 600 (1975). A State's interest in enforcing its criminal laws merits comparable judicial respect when pursued in the federal courts. Cf. *Colorado* v. *Symes,* 286 U. S., at 518.

Respondent here, by obtaining a federal forum, has fully vindicated the federal policies supporting removal. The plainest evidence of this vindication is the District Court's application of the immunity defense. No further purpose of the removal statute would be served by denying the State a right to seek review when that very right is available under applicable state law. On the contrary, it would be anomalous to conclude that the State's appellate rights were diminished solely because of the removal. The statutory goal of ensuring fair and impartial adjudication is not advanced when the State in effect can be penalized by the defendant's decision to remove a criminal prosecution. Absent any indication that the removal statute was intended to derogate from the State's interest in evenhanded enforcement of its laws, we see no justification for providing an unintended benefit to a defendant who happens to be a federal officer.[18]

---

[18] By enacting the current version of 18 U. S. C. § 3731, see 84 Stat. 1890, Congress manifested an intent to remove all statutory barriers to a criminal appeal taken by the Federal Government. *United States* v. *Wilson,* 420 U. S. 332, 337 (1975). Petitioner argues that this intent should inform our deliberations concerning a state prosecution's appellate rights upon removal to federal court. A proper respect for the State's

## B

Although the purposes of the removal statute do not support denial of a State's customary right to seek appellate review, we do not suggest that this alone establishes the State's right to appeal in federal court. Authorization to seek review under Arizona law is not a grant of federal appellate jurisdiction. Nor, when added to the conclusion that removal itself fails to diminish Arizona's appellate rights, does this authorization amount to a grant of equivalent federal jurisdiction at the appellate level. Because the criminal removal statute does not confer federal *appellate* jurisdiction, some independent federal basis is required if a State is to perfect its appeal. Petitioner contends in part that such authorization derives from 28 U. S. C. § 1291, the general statutory grant of appellate jurisdiction. Brief for Petitioner 49–58. Respondent argues, however, that § 1291 cannot support Arizona's appeal because it has been found inadequate, standing alone, to support a criminal appeal by the Federal Government. Brief for Respondent 32–40. This argument deserves close attention, for it draws on the important tradition disfavoring criminal appeals by the sovereign.

Under 28 U. S. C. § 1291, any litigant armed with a final judgment from a lower federal court is entitled to take an appeal. By its terms, the statute addresses neither the identity of particular parties nor the nature of the prior legal

---

interest in enforcing its own criminal laws, however, counsels against that conclusion. While the policy announced in § 3731 might perhaps be viewed as indicative of congressional support for any prosecutor's appeal in federal court, the statute does not speak in such terms. Moreover, if § 3731 is construed to extend broad appellate rights to a State that does not authorize comparable rights under state law, one result might be to inhibit the exercise of the removal right, contrary to established federal policy. In light of these uncertainties, and our resolution of the case on other grounds, we do not reach the question whether § 3731 applies to the States.

proceedings.[19]   But while it is settled that a civil appeal, or an appeal by the defendant in a criminal case, may be taken from any final decision of a District Court, this Court has observed on prior occasions that, " 'in the federal jurisprudence, at least, appeals by the Government in criminal cases are something unusual, exceptional, not favored.' " *Will* v. *United States*, 389 U. S. 90, 96 (1967), quoting from *Carroll* v. *United States*, 354 U. S. 394, 400 (1957).   This federal policy has deep roots in the common law, for it was generally understood, at least in this country, that the sovereign had no right to appeal an adverse criminal judgment unless expressly authorized by statute to do so.[20]   Accordingly, from the early days of the Republic, most state courts refused to consider appeals by prosecutors who lacked the requisite statutory authority.[21]

---

[19] Congress from the very beginning provided that final civil judgments were reviewable as a matter of statutory right.   Judiciary Act of Sept. 24, 1789, § 22, 1 Stat. 84.   Later, when the growing volume of appellate business threatened to overwhelm this Court's docket, Congress acted to establish circuit courts of appeals.   Judiciary Act of Mar. 3, 1891, 26 Stat. 826.   See, *e. g.*, H. R. Rep. No. 1295, 51st Cong., 1st Sess., 3–4 (1890); 21 Cong. Rec. 10220–10222 (1890) (remarks of Sen. Evarts). While preserving, under § 5 of the 1891 Act, 26 Stat. 827, several designated categories of cases under this Court's direct appellate jurisdiction; the Act, in § 6, conferred on the new intermediate appellate court the power to review and revise final judgments in all other cases, civil and criminal, "unless otherwise provided by law."   26 Stat. 828.   Through a succession of recodifications and technical amendments, § 6 of the 1891 Act has been carried forward as 28 U. S. C. § 1291.

[20] There is disagreement among scholars as to whether, at common law in England, the prosecution could appeal.   See R. Moreland, Modern Criminal Procedure 273 (1959); L. Orfield, Criminal Appeals in America 57 (1939); Miller, Appeals by the State in Criminal Cases, 36 Yale L. J. 486, 491 (1927); Note, Criminal Procedure—Right of State to Appeal, 45 Ky. L. J. 628, 629 (1957).   See generally *United States* v. *Sanges*, 144 U. S. 310, 312 (1892).

[21] See *United States* v. *Sanges*, 144 U. S., at 313–318, and cases cited therein.   See also L. Orfield, Criminal Appeals in America 58 (1939);

Both prudential and constitutional interests contributed to this tradition. The need to restrict appeals by the prosecutor reflected a prudential concern that individuals should be free from the harassment and vexation of unbounded litigation by the sovereign. See, *e. g., State* v. *Jones,* 7 Ga. 422, 425–426 (1849); *People* v. *Corning,* 2 N. Y. 9, 16 (1848). This concern also underlies the constitutional ban against double jeopardy, which bars an appeal by the prosecutor following a jury verdict of acquittal. See, *e. g., People* v. *Webb,* 38 Cal. 467, 476–480 (1869); *State* v. *Burris,* 3 Tex. 118 (1848); *State* v. *Hand,* 6 Ark. 169, 171 (1845). See also *Burks* v. *United States,* 437 U. S. 1, 16 (1978); *Fong Foo* v. *United States,* 369 U. S. 141, 143 (1962). See generally *United States* v. *DiFrancesco,* 449 U. S. 117, 129–130 (1980). In general, both concerns translate into the presumption that the prosecution lacks appellate authority absent express legislative authorization to the contrary.

This presumption was first announced as a rule of federal law in *United States* v. *Sanges,* 144 U. S. 310 (1892). There, the Court held that no appellate right by the Federal Government exists in the absence of express enabling legislation from Congress. The Court also concluded that the general grant of appellate jurisdiction contained in the Judiciary Act of 1891 did not satisfy this requirement.[22] In subsequent decisions, the Court has reaffirmed that the Federal Government enjoys no inherent right to appeal a criminal judgment, and that the grant of general appellate jurisdiction, now contained in 28 U. S. C. § 1291, does not authorize such a federal appeal. *DiBella* v. *United States,* 369 U. S. 121, 130 (1962); *Carroll* v. *United States,* 354 U. S.

---

Comment, State Appeals in Criminal Cases, 32 Tenn. L. Rev. 449, 450–451 (1965).

[22] In *Sanges,* the Government sought review of a lower court judgment quashing the federal indictment. The Court determined that no provision of the new 1891 Judiciary Act had conferred upon the United States the right to appeal a criminal judgment. 144 U. S., at 322–323.

394, 400–403 (1957). See *Will* v. *United States,* 389 U. S. 90, 96–97 (1967); *United States* v. *Burroughs,* 289 U. S. 159, 161 (1933).

Respondent contends that *Sanges* and its progeny must be read to foreclose a criminal appeal in federal court by *any* governmental entity unless the appellate right derives from an express *federal* statute. We do not believe that *Sanges* is to be so broadly construed. *Sanges* holds simply that the federal sovereign may not subject one of its citizens to continued federal prosecution in its own courts where it has not been expressly permitted to do so under federal law. 144 U. S., at 323.[23] Our continuing refusal to assume that the United States possesses any inherent right to appeal reflects an abiding concern to check the Federal Government's possible misuse of its enormous prosecutorial powers. By insisting that Congress speak with a clear voice when extending to the Executive a right to expand criminal prosecutions, *Sanges* and its subsequent applications have placed the responsibility for such assertions of authority over citizens in the democratically elected Legislature where it belongs. Congress has properly assumed this responsibility by first defining, and then broadening and clarifying, the Federal Government's right to appeal an adverse criminal judgment.[24]

---

[23] After finding no such express permission in the federal statute there at issue, the Court concluded as follows:

"In none of the provisions of this act, defining the appellate jurisdiction, either of this court, or of the Circuit Court of Appeals, is there any indication of an intention to confer upon the United States the right to bring up a criminal case of any grade after judgment below in favor of the defendant. It is impossible to presume an intention on the part of Congress to make so serious and far-reaching an innovation in the criminal jurisprudence of the United States." *Id.,* at 323.

[24] At least partially in response to the *Sanges* decision, Congress passed the Criminal Appeals Act of Mar. 2, 1907, ch. 2564, 34 Stat. 1246, conferring limited rights of appeal on the United States in criminal cases. See, *e. g.,* H. R. Rep. No. 2119, 59th Cong., 1st Sess., 3 (1906);

The concern to restrict prosecuting authority to express congressional grants, however, does not justify a requirement of express authorization by *Congress* when the sovereign seeking to appeal is a State rather than the Federal Government. Nothing in the language or logic of the *Sanges* opinion contains any suggestion of that kind. Nor should such an intimation be read into the Court's subsequent decisions adhering to *Sanges'* principle.[25] For the purposes of

S. Rep. No. 5650, 59th Cong., 2d Sess., 1 (1907). Following this Court's opinion in *United States* v. *Sisson,* 399 U. S. 267 (1970), Congress broadened the Federal Government's right of appeal to its current status under 18 U. S. C. § 3731. 84 Stat. 1890.

[25] Respondent and the dissent unsuccessfully attempt to derive support from the decision in *Maryland* v. *Soper,* 270 U. S. 9 (1926). There this Court awarded Maryland mandamus relief after the State had challenged the legality of removing a particular criminal prosecution to federal court. In general, this decision supports the ability of a State to secure review in a removed criminal prosecution. Moreover, the decision held simply that mandamus was appropriate in the absence of any other means of reviewing the District Court's order refusing remand. Respondent and the dissent seek to rely on the Court's further statement in *Soper,* 270 U. S., at 30, that once a criminal action is removed to federal court "a judgment of acquittal in that court is final. *United States* v. *Sanges,* 144 U. S. 310." Although this statement is merely dictum, to respondent and the dissent it implies that a state prosecutor lacks congressional authorization to take an appeal in federal court. We, however, adopt what we view as a more sensible reading, namely, that the Court's statement reflects an awareness of controlling double jeopardy doctrine, which at the time was thought to protect a defendant once a judgment of acquittal had been entered in federal court. See, *e. g., Kepner* v. *United States,* 195 U. S. 100, 130, 133 (1904); *United States* v. *Ball,* 163 U. S. 662, 671 (1896). But see *United States* v. *Wilson,* 420 U. S. 332 (1975). Since this Court had earlier assumed without deciding that the Double Jeopardy Clause of the Fifth Amendment applied to state prosecutions, see *Dreyer* v. *Illinois,* 187 U. S. 71, 85–86 (1902), it would not have been unreasonable for a state court or prosecutor to make the same assumption in 1926. Of course, the decision in *Soper* could hardly reflect awareness that 11 years later the Court would decline to extend Fifth Amendment double jeopardy protection in prosecutions brought by a State. See *Palko* v. *Connecticut,* 302 U. S. 319 (1937), overruled by *Benton* v. *Maryland,* 395 U. S. 784 (1969).

congressional restriction of prosecution by the sovereign, the Federal Executive, not the State, is the relevant sovereign. The decision to limit or extend a State's appellate authority is a matter of state law within constitutional constraints. If a State wishes to empower its prosecutors to pursue a criminal appeal under certain conditions, it is free so to provide, limited only by the guarantees afforded the criminal defendant under the Constitution. Requiring Congress also to address explicitly the State's authority contributes nothing to the policy concerns that prompt the requirement of express sovereign action. There is, in short, no basis for concluding that Congress' neglect specifically to authorize a state appeal in a removed criminal proceeding impairs the appellate rights of the state prosecutor acting to enforce his separate body of criminal law.

In sum, the Court's prior decisions restricting the availability of § 1291 in a criminal context flow from a tradition of requiring that a prosecutorial appeal be affirmatively sanctioned by the same sovereign that sponsors the prosecution. The intention to restrict sovereign power in this area is adequately addressed when the legislature responsible for that power has spoken in express terms, or when a legislative enactment has been authoritatively construed by the sovereign's highest court. We conclude that § 1291 neither compels nor forecloses appellate jurisdiction in an appeal taken by a State as prosecutor. Instead, the provision permits a State to appeal if it is authorized to do so by state law. Petitioner Arizona can rely on § 1291 combined with appellate authorization from the Arizona Legislature.[26] In the circumstances of this case, no more is required.[27]

---

[26] The relevance of state authorization to our jurisdictional determination under 28 U. S. C. § 1291 does not affect the exclusively federal character of the forms of review available once the state sovereign enters federal court. Thus, while Arizona's authorization of appellate review by certiorari has no precise analogue in the federal system, it is necessary to

## III

We hold that in a criminal proceeding removed to federal court, a State may appeal under § 1291 from an adverse judgment if statutory authority to seek such review is conferred by state law. Because Arizona law conferred such authority here, and because removal does not alter the nature of the authority conferred, the State must be allowed to appeal from the post-guilty-verdict judgment of acquittal. Accordingly, the judgment of the United States Court of Appeals is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE STEVENS, concurring.

There is a distinction between a court's power to accept an appeal and an executive's power to prosecute an appeal. The question whether the United States Court of Appeals in this case had jurisdiction to entertain the appeal is a federal

---

choose from among the available forms of federal review. As noted above, Arizona law authorizing review for abuse of discretion is administered in a sufficiently routine manner as to be more akin to ordinary federal appellate review than to the federal mandamus remedy reserved for extraordinary circumstances. We express no view regarding the correct federal analogue for a State with a right of review that is more limited than that afforded by Arizona law.

[27] We have no occasion to address the situation where state law does not authorize the review sought by its prosecutor in federal court. We note, however, that in the majority of States the prosecution possesses at least some rights to appeal from an adverse judgment in a criminal case. See Note, Limited Right of Appeal for the State, 14 Hous. L. Rev. 735, 737 (1977). Similarly, because we find that appellate jurisdiction exists under § 1291 combined with relevant Arizona law, we do not decide the applicability of § 3731 to the States. See n. 18, *supra.*

The dissent suggests that this case presents an anomalous circumstance. But an anomaly is created only if we accept that Congress denied a State the right, established under state law, to prosecute an appeal when the proceeding is removed to federal court.

question. I agree with the Court's conclusion that such jurisdiction is conferred by 28 U. S. C. § 1291.*

The question whether the prosecutor had authority to prosecute an appeal is, I believe, a question controlled by the law of the sovereign that the prosecutor represents. I therefore agree with the Court's conclusion that the holding in *United States* v. *Sanges,* 144 U. S. 310, to the effect that a federal prosecutor had no such authority in 1892, is not controlling in this case. The controlling authority is conferred by Arizona, which does empower its prosecutors to appeal in the situation presented here.

Although this simple analysis persuades me to join the Court's opinion, I write separately to emphasize that it lends no support to an argument that 18 U. S. C. § 3731 or any other federal statute would authorize an appeal by a state prosecutor.

JUSTICE BRENNAN, with whom JUSTICE MARSHALL joins, dissenting.

*United States* v. *Sanges,* 144 U. S. 310 (1892), announced the general rule that governments may not appeal in criminal cases in the federal courts in the absence of express statutory authority. Finding, *inter alia,* that the predecessor to 28 U. S. C. § 1291 was not sufficiently express,[1] *Sanges* refused to allow an appeal by the Federal Government. To-

---

*Title 28 U. S. C. § 1291 provides in part:

"The courts of appeals shall have jurisdiction of appeals from all final decisions of the district courts of the United States . . . ."

[1] This statute, the Judiciary Act of 1891, provided that "appeals or writs of error may be taken from the district courts or from the existing circuit courts direct to the Supreme Court . . . [i]n any case that involves the construction or application of the Constitution of the United States," 26 Stat. 827–828, and to the circuit courts of appeal from final decisions of the district courts "in all cases other than those provided for in the preceding section of this act, unless otherwise provided for by law," *id.,* at 828.

day, however, the Court intertwines § 1291 with an Arizona statute authorizing writs of certiorari on behalf of the State in criminal cases in the Arizona courts to make § 1291 "sufficiently express" to authorize a State to appeal from a federal district court's judgment of acquittal. Because this result flouts Congress' authority to regulate the jurisdiction of the lower federal courts, I respectfully dissent.

## I

The Court proposes the novel interpretation of *Sanges* and its progeny as "flow[ing] from a tradition of requiring that a prosecutorial appeal be affirmatively sanctioned by the same sovereign that sponsors the prosecution." *Ante,* at 249.[2] I find this reading of the *Sanges* rule inaccurate: in my view, *Sanges* plainly requires express authorization *from the legislative body controlling federal-court jurisdiction* for all government appeals in criminal cases in the federal courts.[3] The Court stated that the express authorization must be made by the legislature "acting within its constitutional authority." 144 U. S., at 318. Since Congress is the only entity constitutionally empowered to grant express authority for government appeals *in the federal courts,* the *Sanges* principle necessarily confines our inquiry to whether there is express authorization in federal statutes controlling criminal appeals by the States in federal court. Therefore, the Court's finding that Arizona, the sovereign sponsoring the prosecution in the instant case, has sanctioned prosecutorial appeals in *its courts* is irrelevant to the question of federal appellate jurisdiction

---

[2] The Court also finds that allowing an appeal would not frustrate the removal statute's primary purpose of providing an impartial setting in which a federal official's immunity defense may be considered. *Ante,* at 241–242. But the Court candidly admits that this alone would not establish the State's right to appeal in federal court. *Ante,* at 244.

[3] Because *Sanges* dealt with a Government appeal to this Court, see n. 1, *supra,* the Court observed that "[t]he appellate jurisdiction of [this Court] rests wholly on the acts of Congress." 144 U. S., at 319.

here. Focusing as we must on federal statutes, I find the pertinent federal statutes wholly barren of any express authorization of criminal appeals by States to the federal courts of appeals.[4] Today, as in 1892, § 1291 "says nothing as to the party by whom the writ of error may be brought, and cannot therefore be presumed to have been intended to confer upon the government the right to bring [an appeal]." *Id.,* at 323.

This conclusion is supported by *Maryland* v. *Soper,* 270 U. S. 9 (1926), which relied on the *Sanges* rule to conclude that a State has no right of appeal from a decision of a federal district court in a criminal case removed from state court. In *Soper,* four United States prohibition agents and their chauffeur were indicted for murder in the State of Maryland. The defendants petitioned the Federal District Court for removal, averring that they were federal agents[5] and that their acts "were done in the discharge of their official duties as prohibition agents." 270 U. S., at 22. The District Court granted defendants' petition and the State subsequently applied to this Court for a writ of mandamus to overturn the removal order. Over respondent's objection that mandamus did not lie to correct an erroneous removal order, this Court granted the writ. Observing that "there should be a more liberal use of mandamus [in removal of State criminal cases] than in removal of civil cases," *id.,* at 29, the Court specifically noted:

> "Except by issue of mandamus, [the State] is without an opportunity to invoke the decision of this Court upon the issue it would raise. The order of the United States District Judge refusing to remand is not open to re-

---

[4] Title 18 U. S. C. § 3731, authorizing criminal appeals from federal district courts *by the United States,* obviously cannot be read to give that authority to state prosecutors in removal cases.

[5] The petition claimed that the chauffeur was assisting the four agents under the authority of the Prohibition Director.

view on a writ of error, and a *judgment of acquittal in that court is final. United States* v. *Sanges,* 144 U. S. 310 . . . ." *Id.,* at 30 (emphasis added).

Significantly, the predecessor to § 1291 was available then, as it is now, to support an argument that the State had a right of appeal. Nonetheless, on the strength of *Sanges,* the Court concluded that a judgment of acquittal was unreviewable [6] because there was no express *federal* statute authorizing an appeal by the State. See *Government of Virgin Islands* v. *Hamilton,* 475 F. 2d 529, 530–531 (CA3 1973).

The Court attempts to deflect the force of this precedent by interpreting *Maryland* v. *Soper* as merely "reflect[ing] an awareness of controlling double jeopardy doctrine, which at the time was thought to protect a defendant once a judgment of acquittal had been entered in federal court." *Ante,* at 248, n. 25. But this is a clearly incorrect reading, for it ignores the fact that at the time *Maryland* v. *Soper* was decided, the prohibition contained in the Fifth Amendment's Double Jeopardy Clause was applicable only against the *Federal Government in federal prosecutions,* and not against *state governments in state prosecutions.* See *Palko* v. *Connecticut,* 302 U. S. 319 (1937).[7] It was not until 32 years later that *Benton*

---

[6] The State of Maryland had conceded as much in its argument in its brief that, "[s]hould the final judgment be an acquittal, in whole or in part, the State could not have a writ of error to review it. *United States* v. *Sanges,* 144 U. S. 310. Unless this Court entertains the petition for mandamus, the State is without any redress." See *Maryland* v. *Soper,* 270 U. S., at 12.

[7] In *Palko,* the Court rejected the broad thesis that "[w]hatever would be a violation of the original bill of rights (Amendments I to VIII) if done by the federal government is now equally unlawful by force of the Fourteenth Amendment if done by a state." 302 U. S., at 323. Observing that "[t]o retry a defendant, though under one indictment and only one, subjects him, it is said, to double jeopardy in violation of the Fifth Amendment, if the prosecution is one on behalf of the United States," the Court declined to adopt the argument that "there is a denial of life or liberty without due process of law, if the prosecution is one on behalf of the People of a State." *Id.,* at 322.

v. *Maryland,* 395 U. S. 784 (1969), overruled *Palko* and held that the Double Jeopardy Clause was applicable against the States. Since the Double Jeopardy Clause did not apply to prosecutions initiated by the States, and state substantive law governed criminal cases removed to federal district court, *Tennessee* v. *Davis,* 100 U. S. 257, 271 (1880), the Court's suggestion that the statement in *Maryland* v. *Soper* referred to double jeopardy limitations is plainly unfounded.

## II

Even on its own terms the Court's opinion is unpersuasive. The Court concludes that appeals by the States are permissible under § 1291 "when the legislature responsible for that power has spoken in express terms, or when a legislative enactment has been authoritatively construed by the sovereign's highest court." *Ante,* at 249. The Arizona statute supposedly authorizing appeal, however, is anything but "express." That statute provides:

> "The writ of certiorari *may be granted* by the supreme and superior courts or by any judge thereof, in all cases when an inferior tribunal, board or officer, exercising judicial functions, has exceeded its jurisdiction and there is no appeal, nor, in the judgment of the court, a plain, speedy and adequate remedy." Ariz. Rev. Stat. Ann. §12–2001 (1956) (emphasis added).

The State may obtain a writ of certiorari by filing a petition for special action pursuant to Rule 4, Rules of Procedure for Special Actions, vol. 17A, Ariz. Rev. Stat. Ann. (1973).

If it be true the State's petition for review "has been routinely granted" by the appellate courts, *ante,* at 240, this hardly qualifies as an authoritative construction by the State's highest court that the *statute itself* authorizes review in every case. The Court has failed to cite a single precedent in which the Arizona Supreme Court has investigated the intent of the state legislature in passing the statute authoriz-

ing prosecutorial appeals. More importantly, by relying on state-court decisions allowing certiorari review on behalf of the State, the Court has undercut the only rationale justifying today's result. The Court reasons:

"Our continuing refusal to assume that the United States possesses any inherent right to appeal reflects an abiding concern to check the Federal Government's possible misuse of its enormous prosecutorial powers. By insisting that Congress speak with a clear voice when extending to the Executive a right to expand criminal prosecutions, *Sanges* and its subsequent applications have placed the responsibility for such assertions of authority over citizens in the democratically elected legislature where it belongs." *Ante,* at 247.

It is difficult to understand how the Court's insistence that the democratically elected legislature speak with a clear voice can be satisfied without interpretive decisions of the State's highest court holding that the state legislature has done so in the case of § 12–2001. Indeed, the Court's application of a less stringent requirement of clarity in the case of state legislation than in the case of federal legislation, see, *e. g.,* *United States* v. *Martin Linen Supply Co.,* 430 U. S. 564, 568 (1977) ("express congressional authorization"); *United States* v. *Wilson,* 420 U. S. 332, 336 (1975) ("express statutory authority"); *DiBella* v. *United States,* 369 U. S. 121, 130 (1962) ("expressly authorized by statute"); *Carroll* v. *United States,* 354 U. S. 394, 399 (1957) ("expressly conferred by statute"); *United States* v. *Burroughs,* 289 U. S. 159, 161 (1933) ("express statutory authority"); *United States* v. *Sanges,* 144 U. S., at 318 ("statute expressly giving the right"), is surely unprecedented. The Court has offered no justification for its more expansive treatment of state statutes. Indeed, since the Court has convinced itself that there are "express" provisions in the Arizona statute, I see no logical barrier—under the Court's novel determination of what is

"express"— to a construction of § 1291 as an express grant of authority for state appeals, *without reference to state statutes.*

## III

The Court has noted time and again that appeals by the government in criminal cases are exceptional and not favored. *E. g., Will* v. *United States,* 389 U. S. 90, 96–97 (1967); *DiBella* v. *United States, supra,* at 130; *Carroll* v. *United States, supra,* at 400. I would have thought, therefore, that the Court would be especially careful before concluding that Congress intended that § 1291 would authorize criminal appeals by the State in removal cases.[8] See *Will* v. *United States, supra,* at 96–97 ("the Criminal Appeals Act is strictly construed against the Government's right of appeal"). Instead, the Court has abandoned its traditional presumption in this area to imply—on the strength of its own policy analysis— authorization for a state appeal in a criminal case where no federal statute expressly authorizes one. But

"[i]t is axiomatic . . . that the existence of appellate jurisdiction in a specific federal court over a given type of case is dependent upon authority expressly conferred by statute. And since the jurisdictional statutes prevailing at any given time are so much a product of the whole history of both growth and limitation of federal-court jurisdiction . . . , they have always been interpreted in the light of that history and of the axiom that clear statutory mandate must exist to found jurisdiction." *Carroll* v. *United States, supra,* at 399.

---

[8] Indeed, until Congress amended 18 U. S. C. § 3731 in 1971, no appeal would have been permitted the United States in a prosecution similar to the instant case. The Court's opinion today introduces the anomaly that § 1291 could be interpreted to permit appeals by state, but not by federal, prosecutors in federal court. Surely it is more reasonable to read § 1291 as not authorizing government appeals in *any* criminal case, whether federal or state.

It is hard to imagine a federal "statutory mandate" for government appeals that is less clear than one that fluctuates depending on state law.

This case admittedly presents an anomalous circumstance,[9] and concededly there is great temptation to correct it. But because I believe it is for Congress, not the courts, to make changes in federal jurisdictional statutes, cf. *Will* v. *United States, supra,* at 97, n. 5, I respectfully dissent.

---

[9] I suspect that Congress has never considered the issue presented in this case. The Court does not suggest the contrary.