UNITED STATES, Petitioner,

v.

Michael V. SCHOLZ, 508 68 5401, Fire Control Technician (Guns) Chief (E-7), U.S. Navy, Appellee.

Miscellaneous Docket No. 84-03.

U.S. Navy-Marine Corps Court of Military Review.

Dec. 31, 1984.

LTCOL M.W. Lucas, USMC, Appellate Defense Counsel.

MAJ Michael E. Canode, USMC, Appellate Defense Counsel.

LT Douglas R. Folkert, JAGC, USNR, Appellate Government Counsel.

GORMLEY, Chief Judge:

Pursuant to Article 62 of the Uniform Code of Military Justice (U.C.M.J.), 10 U.S.C. § 862 and in compliance with Rules for Court-Martial, (R.C.M.), Rule 908(b), *Manual for Courts-Martial, 1984,* (M.C.M. 1984), and section 0131 of *JAGNOTE* 5800 of 17 July 1984, the government filed an appeal requesting this Court to reverse a ruling of the military judge that terminated the proceedings below in this case.

## HISTORY OF THE CASE

On 2 August 1984, the accused was arraigned before a Special Court-Martial on a single charge of violating Article 134 of the U.C.M.J., 10 U.S.C. § 934, supported by two specifications alleging use and possession of cocaine. After arraignment, but prior to evidence being presented on the merits, the accused made the following two Motions in Limine: a motion to dismiss the charge for lack of speedy trial and a motion to suppress the evidence of tests conducted upon the accused's urine by the Center for Human Toxicology at the University of Utah, Salt Lake City, Utah. Neither motion was supported by a written brief. The military judge denied the motion to dismiss, but granted the motion to suppress. On reconsideration, he upheld his ruling. Trial counsel gave timely notice, on the record, of the government's decision to appeal that ruling pursuant to Article 62, U.C.M.J. and R.C.M. 908. Written notice of appeal was served on the military judge on 4 August 1984.

## STATEMENT OF FACTS

On 27 February 1984, at Trident Refit Facility, Bangor, Washington, the accused submitted a urine sample pursuant to a random sweep inspection authorized by Commander, Submarine Force, U.S. Pacific Fleet. His sample was submitted, along with those of other individuals from the command, to the Naval Drug Screening Lab, Oakland, California. On 12 March

1984, the drug lab, after performing both Radioimmunoassay (R.I.A.) and Gas Liquid Chromatography (G.L.C.) tests, sent a message indicating that the accused's urine had tested positive for cocaine. Shortly thereafter, Trident Refit Facility requested that the Oakland lab re-test the accused's sample using a Gas Chromatography/Mass Spectrometry (G.C./M.S.) technique. The lab complied with this request and again a positive result was reported.

The G.C./M.S. was performed despite the fact that Commander, Naval Medical Command had not promulgated any Standard Operating Procedure for the use of the G.C./M.S. test to detect the presence of cocaine. However, the lab's commanding officer had devised his own "in-house" procedures. Apparently perceiving potential evidentiary problems in the manner in which the Oakland lab performed the G.C./M.S., the sample was sent to the Center for Human Toxicology at the University of Utah for another G.C./M.S. re-test. This civilian laboratory was not certified by DoD to perform this type of test for cocaine.

In his Motion in Limine, the accused argued for the exclusion from evidence of the Center for Human Toxicology's lab results on the grounds that they were obtained in violation of Department of Defense Directive 1010.1, which establishes policies for urinalysis testing. In support of its motion, the defense called the former Chief of the Department of Toxicology at the Armed Forces Institute of Pathology, then serving as Chief of Clinical Laboratory Services at David Grant Air Force Medical Center, Travis Air Force Base. He testified that the purpose of lab certification in accordance with DoD Directive 1010.1 is to limit urine testing to those laboratories where it has been determined that there is the ability accurately to test for, and report out, results for a particular substance. He also testified that, as of the time of trial, no civilian lab was certified by the Department of Defense to report test results for cocaine. Over government's objections to his competency to testify on the matter, the witness further explained that, although his involvement with the instruction primarily centered around its technical aspects, it was his opinion that testing at a non-certified lab would be contra to the policy underlying the instruction.

The military judge, in granting the motion, ruled that due process required that the evidence from the Center for Human Toxicology be excluded on the grounds that DoD Directive 1010.1 had been violated and that, since the Government had promulgated the regulation for the protection of the accused, it was, therefore, bound by its own Directive. In reaffirming his ruling on reconsideration, the military judge ruled that the Directive was designed to afford the accused due process of law, with the requirements being based on "obvious constitutional underpinnings".

## ISSUES

On appeal, the government asks this Court to reverse the military judge's suppression ruling and, in support, assigns the following issues.

### I.

DID THE MILITARY JUDGE ERR IN RULING THAT THE ADDITIONAL CONFIRMATORY TESTING PERFORMED BY A NON–DoD CERTIFIED LABORATORY, AFTER COMPLETION OF TESTING IN A DoD CERTIFIED LABORATORY, VIOLATE DEPARTMENT OF DEFENSE INSTRUCTION 1010.1, (sic) DATED 16 MARCH 1983?

### II

DID THE MILITARY JUDGE ERR IN FINDING THAT A VIOLATION OF DOD INSTRUCTION 1010.1 (sic) BY ADDITIONAL CONFIRMATORY TESTING OF THE ACCUSED'S SAMPLE AT A NON–DoD CERTIFIED LABORATORY ENTITLED THE ACCUSED TO THE REMEDY OF EXCLUSION OF THE EVIDENCE PROVIDED BY THAT RETEST?

Counsel for the Respondent contends that this Court lacks jurisdiction to review the ruling in that the evidence subject to the military judge's ruling was cumulative and, thus, not substantial proof of a fact material to the proceeding.

## DISCUSSION

■ It is a well established principle of common law that, without specific statutory authority, the United States cannot appeal an adverse ruling or decision in a criminal action. *United States v. Sisson,* 399 U.S. 267, 90 S.Ct. 2117, 26 L.Ed.2d 608 (1970). Prior to 1 August 1984, the effective date of the Military Justice Act of 1983, PL 98–209, 97 Stat. 1393 (1983), this Court lacked jurisdiction to hear appeals from the government. *See United States v. Rowel,* 1 M.J. 289 (C.M.A.1976), (Fletcher, C.J., concurring). However, under the provisions of the *Manual for Courts-Martial, United States, 1984,* promulgated by that Act, the United States is given the right to take such an appeal. U.C.M.J., Art. 62; R.C.M. 908. This Article sets out certain qualifications to the right, including limitations as to the type of courts-martial from which an appeal can be taken. It also enumerates the types of rulings and decisions that are appealable. Among these are rulings that "exclude(s) evidence that is substantial proof of a fact material in the proceeding." U.C.M.J., Art. 62. It is based upon this clause that the respondent claims a lack of appellate authority.

■ With respect to this issue of jurisdiction, we are faced with a case of first impression. We are not, however, entirely without guidance, for the legislative history of the Act gives us initial insight into the matter. S.Rep. No. 53, 98th Cong., 1st Sess. 23 (1983); H.R.Rep. No. 549, 99th Cong., 1st Sess. 19 (1983), U.S.Code Cong. & Admin.News 1983, p. 2177. In both the Senate and House reports, reference is made to the fact that Article 62 closely tracks 18 U.S.C. § 3731, the provision giving the United States the right of appeal in civilian criminal matters. This statute employs the identical, "substantial proof of a material fact", language as is found in Article 62. Therefore an examination of the case law pertaining to 18 U.S.C. § 3731 is dispositive of this issue.

■ Once Congress acted to allow appeals by the United States, they manifested the intent to remove all statutory and common law barriers. *Arizona v. Manypenny,* 451 U.S. 232, 101 S.Ct. 1657, 68 L.Ed.2d 58 (1981). This, of course, does not preclude a challenge on constitutional grounds, such as double jeopardy. Interpretations invoking broad construction have been given to the government's right to appeal from interlocutory orders suppressing or excluding evidence. *United States v. Humphries,* 636 F.2d 1172 (9th Cir.1980). It is not necessary that the evidence suppressed be the only evidence in the case. *See, United States v. Helstoski,* 442 U.S. 477, 99 S.Ct. 2432, 61 L.Ed.2d 12 (1979). So long as it is alleged that the evidence is substantial, the Petitioner will come within the appellate court's jurisdiction. If the essence of the appeal expresses the substantial nature of the evidence, the wording of the appeal need not track the statutory, "substantial...", language. *In re Special September 1978 Grand Jury II,* 640 F.2d 49 (7th Cir.1980).

We are not unmindful of the concerns of the drafters of this legislation that excessive use of this right to appeal would impose an excessive burden upon all aspects of the military justice system. *See,* Analysis to R.C.M. 908. However, we are constrained to interpret the provision in accordance with applicable law. Therefore, short of a constitutional bar, the United States has a broad right of appeal under Article 62, U.C.M.J. While this may mean that many rulings are potentially eligible for appellate review, from a practical standpoint, the military's interest in preventing a backlog within its own system will act to prevent an abuse of the right. Any further limitation on the exercise of appellate review is an area for legislative, not judicial action.

Viewing the facts *sub judice*, we find that the Petitioners have properly alleged that the excluded evidence was substantial proof of a fact material to the proceedings. We are not persuaded by the Respondent's argument that the evidence was cumulative. In an interlocutory appeal, it is beyond the scope of this Court to speculate as to what weight or importance a particular piece of evidence might have at trial. It is sufficient that the petitioner believes that the evidence is significant enough to seek reversal of a military judge's exclusionary ruling rather than continue at trial with whatever other evidence that might be available. Accordingly, we hold that this Court has jurisdiction to hear Petitioner's appeal.

We next turn to the government's contention that the military judge erred in excluding the results of the urinalysis performed at a non-DoD certified laboratory.

At trial, the defense argued that the performance of a urinalysis re-test by a lab not certified in accordance with Department of Defense Directive 1010.1, violated that regulation and, thus, the accused was denied his right to due process. The Government takes the position that the regulation was not violated by this re-test because the Directive, on its face, covers only the initial screening and confirmation of urine samples. It contends that these tests of the accused's sample had previously been performed at a certified lab. In order to settle this issue we must resolve whether or not DoD Directive 1010.1 was meant to forbid a re-test by a non-certified laboratory after completion of the mandatory testing at a DoD certified lab.

Generally, to determine such intent, we must first look to the plain language of the Directive and, from there, apply the same rules of interpretation that are applicable to statutes. *Rucker v. Wabash Railroad Company,* 418 F.2d 146 (7th Cir.1969); *Trustees of Indiana University Hospital v. United States,* 618 F.2d 736, 223 Ct.Cl. 88 (1980). However, where the language is clear and unambiguous, there is no need to resort to rules of construction and it is not necessary to consider the history which led to the regulation's announcement. *United States v. Ray,* 488 F.2d 15 (10th Cir.1973); *Honeywell, Inc. v. United States,* 661 F.2d 182, 228 Ct.Cl. 591 (1981). Absent any clearly expressed legislative intent to the contrary, the plain language of the regulation is controlling. *Oliver v. Postal Service,* 696 F.2d 1129 (5th Cir.1983). The appropriate methodology is to look to the common sense meaning of the statute or regulation, as well as its purpose, the practical consequences of the suggested interpretations, and the agency's own interpretation. *New York State Commission on Cable Television v. Federal Communications Commission,* 571 F.2d 95 (2nd Cir. 1978), *cert. denied,* 439 U.S. 820, 99 S.Ct. 85, 58 L.Ed.2d 112 (1978).

Among other things, the purpose of DoD Directive 1010.1 is to establish guidelines for quality control, laboratory operation, testing methodologies, and the use of urinalysis results. Government agencies, including those of the military must comply with their own regulations. *Hammond v. Lenfest,* 398 F.2d 705 (2nd Cir.1968); *Librizzi v. United States Navy,* 523 F.Supp. 434 (D.Conn.1981). The Navy is obligated to comply with Department of Defense Directives. *United States ex rel. Coates v. Laird,* 494 F.2d 709 (4th Cir. 1974).

The language of this Directive is clear and unambiguous on its face. Under DoD Directive 1010.1, the Secretaries of the Military Departments are directed to operate or contract for the operation of drug testing labs in order to meet their drug testing requirements. Sections D(6) & D(7) provide for the use of civilian laboratories so long as they maintain proper quality controls and are DoD Certified.

Enclosure 3 of the Directive, entitled "LABORATORY PROCEDURES", specifically discusses the types of testing that are required of all samples, regardless of whether the lab performing the tests is a military lab or a civilian lab certified by the DoD. Specifically, section "D" requires that all urine specimens *shall* be

screened by either a radioimmunoassay or an enzyme immunoassay process, (emphasis added). Section "E" provides that all positive specimens *"shall* be tested by gas liquid chromatography for confirmation", (emphasis added). That section goes on to say that, additionally, "mass spectrometer detection systems *may* be used", (emphasis added). The word "may" is permissive and is to be construed as vesting discretionary power unless the context of its use clearly indicates otherwise. "Shall" imposes a mandatory obligation. *Koch Refining Co. v. United States Department of Energy,* 504 F.Supp. 593 (D.Minn.1980).

Section "G" of that enclosure requires that positive samples be retained for at least sixty days (longer if requested). There is no requirement for further re-testing or forensic confirmation of a sample that has already received the full benefit of the military's drug screening program. After completion of the R.I.A. and G.L.C. tests, the required testing process is complete. The logical reason for retention of the sample is to provide for its availability for evidentiary purposes or for possible additional testing for use at trial. This serves to benefit an accused, as well as the government, in that it enables an accused to get his or her own independent re-testing of a positive sample. An accused, too, is not limited to a DoD certified lab. However, further testing by the government is discretionary and not part of the procedures outlined in, and required by, the Directive. The force of the Directive is limited to the initial screening and first confirmation, with additional testing recognized as possible, but not governed or restricted by this regulation. Whether offered into evidence by an accused or by the government, the fact that the lab performing a G.C./M.S. was not DoD certified is simply a question of weight, not admissibility.

■ When a reading of the instruction is combined with the (in) actions of the Department of the Navy in not developing a quality control program to cover additional testing by a third forensic method (Gas Chromatography/Mass Spectrometry), it is clear that such additional testing is not part of that which is encompassed by this Directive. Clearly, the purpose of the Directive is to provide the Military Departments with an administrative means of identifying drug abusers. DoD Directive 1010.1 does not have as a primary purpose, the preparation and development of trial quality, admissible evidence. The required types of original testing must take place in a DoD certified lab, while any additional re-testing by other methods, is left open. This is sufficient to satisfy the due process rights of a potential accused.

Furthermore, an administrative agency has, within its functions, the ability to interpret its own regulations and generally should be given an opportunity to do so. *Viacom International, Inc. v. F.C.C.,* 672 F.2d 1034 (2nd Cir.1982). Virtually every U.S. court and jurisdiction recognizes that great deference must be afforded to an agency's interpretation of its own regulations. In construing administrative regulations, the interpretation given by the agency itself is the ultimate criterion of its meaning, purposes and intent, and that interpretation has controlling weight unless it is plainly erroneous or inconsistent with the regulation. *United States v. Larionoff,* 431 U.S. 864, 97 S.Ct. 2150, 53 L.Ed.2d 48 (1977); *Udall v. Tallman,* 380 U.S. 1, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965); *Bowles v. Seminole Rock & Sand Co.,* 325 U.S. 410, 65 S.Ct. 1215, 89 L.Ed. 1700 (1945).

■ Without objection from the Respondent, appellant attached as part of its pleading, a memorandum from the Office of the Assistant Secretary of Defense (Health Affairs) to the Chief, Air Force Military Justice Division, dated 22 November 1983. That memorandum interprets DoD Directive 1010.1 as requiring the initial screening and first confirmatory test of a sample to be performed in a DoD certified laboratory. That same memorandum then states that further confirmatory testing in a non-DoD certified lab is not precluded by the Directive. We recognize that, although staff opinion letters are less

authoritative than formal agency interpretations, they, nonetheless, may be entitled to great deference. *Charles v. Krauss Co. Ltd.*, 572 F.2d 544 (5th Cir.1978).

In the present case, the accused's urine sample was first screened as being positive by the R.I.A. test and then confirmed by Gas Liquid Chromatography at the Naval Drug Screening Lab, Oakland, California, a DoD certified lab. Several months later, in preparation for trial, it was re-tested by the Center for Human Toxicology. As such, the subsequent re-test was obtained only after performing all tests required in accordance with DoD Directive 1010.1 and, thus, neither the requirements of the Directive nor the due process rights of the accused were violated. Under these circumstances, the government is no more precluded from entering into evidence the results of this independent test than would be the accused, should he have an independent test performed. Of course, this is subject to the necessary foundational requirements required under the Military Rules of Evidence. It is left to the trier of fact to determine the value of the evidence.

In view of our determination of this issue, the second issue has been mooted.

For the foregoing reasons, this Court finds that the military judge erred in ruling that the additional confirmatory testing performed by a non-DoD certified laboratory, after completion of testing in a DoD certified laboratory, violated Department of Defense Directive 1010.1. Accordingly, the government's appeal is upheld and the ruling of the military judge is reversed. The case is remanded to the trial court for further proceedings not inconsistent with this opinion.

Judges KERCHEVAL and BARR concur.