**HORIZON BANK AND TRUST COMPANY, Plaintiff,**

v.

**Paul FLAHERTY and Susan Manning, Trustees of Custom House Associates Realty Trust, Custom House Associates Limited Partnership, the United States Internal Revenue Service, the Commonwealth of Massachusetts Department of Revenue, Giarrusso Norton Cooley & McGlone, P.C., and Eastern Bank Defendants.**

No. CIV.A.03–11524–WGY.

United States District Court,
D. Massachusetts.

Feb. 5, 2004.

Edward C. Cooley, Giarusso, Norton, Cooley & McGlone, Quincy, MA, for Giarrusso, Norton, Cooley, and McGlone, P.C., Defendant.

William J. Donahue, Devine, Millimet & Branch, Andover, MA, for Horizon Bank and Trust Company, Plaintiff.

Robert J. Hundertmark, Devine, Millimet & Branch, P.A., Andover, MA, for Horizon Bank and Trust Company, Plaintiff.

Martin Jacobs, Brody & Jacobs, Boston, MA, for Eastern Bank, Defendant.

Kevin J. Madden, Quincy, MA, for Paul Flaherty, Defendant.

Eileen Ryan McAuliffe, Massachusetts Department of Revenue Litigation Bureau, Boston, MA, for Susan Manning, Commonwealth of Massachusetts (Department of Revenue), Defendants.

George R. Moore, Devine, Millimet & Branch, PA, Andover, MA, for Horizon Bank and Trust Company, Plaintiff.

Barbara Healy Smith, United States Attorney's Office, Boston, MA, for United States of America (Internal Revenue Service), Defendant.

Stephen J. Turanchik, U.S. Department of Justice, Trial Attorney, Tax Division, Washington, DC, for United States of America (Internal Revenue Service), Defendant.

## MEMORANDUM AND ORDER

YOUNG, Chief Judge.

### I. INTRODUCTION

The plaintiff, Horizon Bank and Trust Company ("Horizon"), brought this action in interpleader in the Massachusetts Superior Court sitting in and for the County of Norfolk to determine the proper disposal of surplus funds available after a foreclosure sale of real property owned by Custom House Associates Realty Trust ("Custom House"). Among the defendants who have an interest in the funds are the United States Internal Revenue Service (the "United States"), the Commonwealth of Massachusetts Department of Revenue (the "Commonwealth"), and the law firm of Giarrusso, Norton, Cooley & McGlone, P.C. ("Giarrusso"). Following removal to this Court, the Commonwealth moved to

dismiss the entire case, Mot. to Dismiss [Doc. No. 5], and Giarrusso has moved for summary judgment, Mot. for Summ. J. [Doc. No. 20].

## A. Undisputed Facts

On August 6, 1998, Custom House granted Giarrusso a mortgage (the "Mortgage") encumbering a parcel of real property (as well as any improvements, equipment, appliances, furnishings, and fixtures situated thereon) located at 125 Sea Street, Quincy, Massachusetts (the "Property"). Compl. ¶ 10, Ex. B (attached to the Notice of Removal [Doc. No. 1]). The Mortgage, recorded at the Norfolk County Registry of Deeds, secured repayment of a promissory note in the original principal amount of $255,960—the outstanding balance of attorneys' fees owed to Giarrusso. Giarrusso's Mem. in Supp. [Doc. No. 21] at 3. Subsequently, Custom House extended a second mortgage on the Property to the plaintiff Horizon as security for a loan (the "Loan") in the original principal amount of $395,000. *See* Compl. ¶ 9. Shortly thereafter Giarrusso subordinated its Mortgage to Horizon. Giarrusso's Mem. in Supp. at 3.

In the following two years, both the United States and the Commonwealth filed tax liens against Custom House's sole beneficiary, Custom House Associates Limited Partnership. Compl. ¶¶ 12–13, Ex. D, E. Specifically, the United States filed tax liens on February 10, 2000, July 18, 2000, and September 14, 2001, in the amounts of $40,850.65, $40,078.53, and $131,635.28 respectively, and the Commonwealth filed three liens on December 13, 2002, in the amounts of $101,670.35, $70,100.75, and $85,976.67. *Id.*

On or about January 1, 2003, Custom House defaulted on its payments to Horizon, and, as a result, Horizon accelerated all outstanding amounts owed under the Loan. *Id.* ¶ 14. Ultimately, Horizon fore-

closed its mortgage and sold the Property at public auction for $800,000.00. *Id.* ¶ 15.

## B. Procedural Posture

On May 30, 2003, after satisfying its own debt, Horizon filed this interpleader action in the Norfolk County Superior Court to determine how to disburse the remaining proceeds from the foreclosure sale, in the amount of $303,153.27, to the subordinate interest and lien holders. *Id.* ¶ 16. Pursuant to 28 U.S.C. §§ 1444 and 2410, the United States timely removed the case to this Court. Notice of Removal. The Commonwealth now seeks to dismiss the entire case on grounds that: "(1) the Eleventh Amendment to the United States Constitution bars this action against the Commonwealth in [federal] Court and (2) the Commonwealth is an indispensable party to this case." Mot. to Dismiss. Also at this time, the defendant Giarrusso moves for summary judgment. Mot. for Summ. J.

## II. DISCUSSION

### A. The Commonwealth's Motion To Dismiss

#### 1. Eleventh Amendment Immunity as a Bar to Suit in Federal Court

■ The Eleventh Amendment affirms that "the fundamental principle of sovereign immunity limits the grant of judicial authority in [Article III of the United States Constitution]." *Pennhurst State School & Hosp. v. Halderman,* 465 U.S. 89, 98, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984). The Amendment reads:

> The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.

U.S. Const. amend. XI. As the Supreme Court has recently stated: "Although the text of the Amendment would appear to restrict only the Article III diversity jurisdiction of the federal courts, 'we have understood the Eleventh Amendment to stand not so much for what it says, but for the presupposition ... which it confirms.'" *Seminole Tribe of Florida v. Florida*, 517 U.S. 44, 54, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996) (quoting *Blatchford v. Native Vill. of Noatak*, 501 U.S. 775, 779, 111 S.Ct. 2578, 115 L.Ed.2d 686 (1991)) (alteration in original); *see Hans v. Louisiana*, 134 U.S. 1, 13, 10 S.Ct. 504, 33 L.Ed. 842 (1890); The Federalist No. 81, p. 487 (Alexander Hamilton) (C. Rossiter ed.1961).[1] Thus, the Eleventh Amendment has been interpreted to constitute a general bar to suit by private individuals against unconsenting states in any tribunal, regardless of the relief sought or the legal source (federal or state) of the claim. *See Fed. Mar. Comm'n v. South Carolina State Ports Auth.*, 535 U.S. 743, 747, 122 S.Ct. 1864, 152 L.Ed.2d 962 (2002) (holding that, absent the state's consent, a federal administrative agency could not adjudicate a private citizen's claim that a state-run port had violated the Shipping Act of 1984); *Alden v. Maine*, 527 U.S. 706, 712, 119 S.Ct. 2240, 144 L.Ed.2d 636 (1999) (holding that Congress could not, in exercise of its powers under Article I of the Constitution, subject a nonconsenting state to private suits for damages in state court); *Seminole Tribe*, 517 U.S. at 47, 116 S.Ct. 1114 (holding that Congress cannot, pursuant to its powers under the Indian Commerce Clause, U.S. Const. art. I, § 8, cl. 2, subject an unconsenting state to suit by an Indian tribe for injunctive relief in federal court); *id.* at 58, 116 S.Ct. 1114 (stating that "the relief sought by a plaintiff suing a state is irrelevant to the question whether the suit is barred by the Eleventh Amendment"); *Cory v. White*, 457 U.S. 85, 90, 102 S.Ct. 2325, 72 L.Ed.2d 694 (1982) ("It would be a novel proposition indeed that the Eleventh Amendment does not bar a suit to enjoin the State itself simply because no money judgment is sought."). *See generally* Boe Morgan, *The Eleventh Amendment Reinterpreted: Will It Erode National Authority?, in Federal Court Judicial Forum* 33 (MCLE 2003).

■ Nonetheless, the Supreme Court has recognized at least two circumstances in which an individual may sue a state in federal court (beyond the obvious and well-settled examples of appealing state court judgments to the Supreme Court and challenging state court convictions through habeas corpus petitions in federal court).[2]

---

1. The Eleventh Amendment was in fact passed in response to the Supreme Court's decision in *Chisholm v. Georgia*, 2 U.S. (2 Dall.) 419, 1 L.Ed. 440 (1793), which permitted a South Carolina citizen to bring a state law assumpsit suit against Georgia as an original action in the Supreme Court based solely on diversity of citizenship. *See Hans*, 134 U.S. at 11, 10 S.Ct. 504. *But see* John J. Gibbons, *The Eleventh Amendment and State Sovereign Immunity: A Reinterpretation*, 83 Colum. L.Rev. 1889, 1926 (1983) (stating that "Congress's initial reaction to the Chisholm decision hardly demonstrates the sort of outrage so central to the profound shock thesis"). For an argument for the "diversity jurisdiction" interpretation of the Eleventh Amendment, under which federal courts can adjudicate private suits against states, so long as subject matter jurisdiction is not based solely on diversity, see *Atascadero State Hospital v. Scanlon*, 473 U.S. 234, 258–302, 105 S.Ct. 3142, 87 L.Ed.2d 171 (1985) (Brennan, J., dissenting, joined by Justices Marshall, Blackmun, and Stevens).

2. There a number of areas where the law is unsettled, but private suit against unconsenting states in *some* court may well be permitted. First, it may be that if a state failed to provide *any* remedy against taxes levied in violation of federal law or unconstitutional takings of property, the individual could sue, if nowhere else, in state court, invoking the

First, Congress may authorize such a suit in the exercise of its power to enforce the Fourteenth Amendment. U.S. Const. amend. XIV, § 5; *Fitzpatrick v. Bitzer*, 427 U.S. 445, 456, 96 S.Ct. 2666, 49 L.Ed.2d 614 (1976). Second, a state may waive its sovereign immunity by consenting to suit in federal court, either through a clear statement of intent to submit to federal court jurisdiction, or through unequivocal litigation conduct demonstrating such submission in a particular case. *See, e.g., College Sav. Bank v. Florida Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 675–76, 119 S.Ct. 2219, 144 L.Ed.2d 605 (1999).

In light of this decisional law, the United States makes the following arguments in opposition to the Commonwealth's Motion To Dismiss:[3] First, the United States argues that because it is the federal government itself (rather than a private party) that is responsible for removing this case to federal court, and the federal government has the power to sue states, the Commonwealth cannot invoke the Eleventh Amendment in this case. United States' Mem. Opp'n [Doc. No. 14] at 8–9. Relatedly, the United States argues that the federal removal statutes applicable in this case have abrogated the Common-

due process protections of the Fourteenth Amendment, U.S. Const. amend XIV, § 1, even absent a federal statute purporting to abrogate state sovereign immunity. *See Reich v. Collins*, 513 U.S. 106, 110, 115 S.Ct. 547, 130 L.Ed.2d 454 (1994) (stating in dicta that the Constitution requires states to provide a remedy for taxes collected in violation of federal law, notwithstanding "the sovereign immunity States traditionally enjoy in their own courts"); *First English Evangelical Lutheran Church of Glendale v. County of Los Angeles*, 482 U.S. 304, 316 & n. 9, 107 S.Ct. 2378, 96 L.Ed.2d 250 (1987) (rejecting, in dicta, an argument that sovereign immunity would bar private suit for money damages, based on an unconstitutional taking, against an unconsenting sovereign); *see also City of Monterey v. Del Monte Dunes at Monterey, Ltd.*, 526 U.S. 687, 714, 119 S.Ct. 1624, 143 L.Ed.2d 882 (1999) (plurality opinion) (suggesting that it is unsettled whether "the sovereign immunity rationale retains its vitality" in just compensation cases); *cf.* Henry M. Hart, Jr., *The Power of Congress To Limit the Jurisdiction of Federal Courts: An Exercise in Dialectic*, 66 Harv. L.Rev. 1362, 1372 (1953) (stating that it is "a necessary postulate of constitutional government ... that a court must always be available to pass on claims of constitutional right to judicial process, and to provide such process if the claim is sustained"). *But see Alden*, 527 U.S. at 740, 119 S.Ct. 2240 (characterizing *Reich* as standing for no more than the proposition that, if state law appears to provide a remedy against unlawfully levied taxes, and a taxpayer pays taxes in reliance

on that law, the state must in fact provide the remedy it promised).

Second, under *Testa v. Katt*, 330 U.S. 386, 67 S.Ct. 810, 91 L.Ed. 967 (1947), states cannot discriminate against plaintiffs based on the source of law on which they rely (federal versus state). *Id.* at 389, 67 S.Ct. 810. The *Alden* majority dismissed a *Testa*-based argument (which it described as a "waiver" argument), stating that "there is no evidence that the State has manipulated its immunity in a systematic fashion to discriminate against federal causes of action." *Alden*, 527 U.S. at 757–58, 119 S.Ct. 2240. This suggests, although it does not require as a matter of logic, that such manipulation might sufficiently offend the Supremacy Clause, U.S. Const. art. VI, to permit overriding of state sovereign immunity. Still, the facts of *Alden* are difficult to distinguish from those in *Testa:* in both cases, parallel state and federal statutes existed, and state courts enforced the former but would not (*Testa*) or could not (*Alden*) enforce the latter. Thus, it may be that the Supreme Court was indirectly saying that *Testa* does not apply in cases where a state's invocation of its sovereign immunity is the source of the state's discrimination against federal rights.

**3.** Horizon does not dispute the Commonwealth's claim that the Eleventh Amendment requires that it be dismissed as a party, although it disagrees with the Commonwealth as to what action this Court should take thereafter. Horizon's Mem. Opp'n [Doc. No. 9] at 2.

wealth's sovereign immunity. *See id.* at 6–7. In the alternative, the United States argues that the Commonwealth has waived its sovereign immunity. *Id.* at 13–15.

### a. Invoking the Eleventh Amendment

The United States argues that since it, and not the private citizen plaintiff, removed the case to federal court, the Commonwealth's Eleventh Amendment immunity is not implicated here. United States' Mem. Opp'n at 8–10. In support, the United States analogizes the case at bar to opinions that have ruled that states cannot invoke the Eleventh Amendment when sued by the United States or impleaded as a third-party defendant by the United States in a suit brought by a private citizen. *Id.* at 9 (citing *United States v. Texas,* 143 U.S. 621, 642–46, 12 S.Ct. 488, 36 L.Ed. 285 (1892), *Barrett v. United States,* 853 F.2d 124 (2d Cir.1988), *Parks v. United States,* 784 F.2d 20, 23–24 (1st Cir. 1986), and *United States v. California,* 328 F.2d 729, 732–34 (9th Cir.1964)). Judge Keeton, however, recently addressed—and rejected—the same analogy in *First Massachusetts Bank v. Daoust,* 214 F.Supp.2d 79 (D.Mass.2002) (Keeton, J.):

> The United States' attempt to characterize both removal and third-party impleader as situations in which the United States "brings the state into federal court" blurs a crucial distinction. In the removal situation, the Commonwealth continues to find itself defending against the private citizen who commenced the suit; in the impleader situation, the Commonwealth must defend itself, as a third-party defendant, only against the *United States.* The fact that courts have held that the Eleventh Amendment does not apply in the latter situation cannot be used as justification for the contention that it should not apply in the former.

*Id.* at 82. *See also Cape Ann Sav. Bank v. Johnson,* 2002 WL 1839248 at 1, No. 02–10032, 2002 U.S. Dist. LEXIS 15282, at *4 (D.Mass. Aug. 12, 2002) (O'Toole, J.) ("[T]he proposed analogies assume that the Commonwealth is subject only to claims by the United States. In the interpleader, however, there will also be claims by interested private parties, including a claim by [the plaintiff] to be released from any obligation to the Commonwealth beyond the payment of the surplus amount into court for appropriate disbursement").

■ This Court agrees with the reasoning set forth in *Daoust.* Therefore, the United States' removal does not extinguish the Commonwealth's immunity from suit by a private party in federal court. Accordingly, the Commonwealth has properly invoked its Eleventh Amendment immunity here, although as the Court explains later in this opinion, that fact does not dispose of the Commonwealth's Motion To Dismiss.

### b. Abrogation of Sovereign Immunity

■ In its brief, the United States argues that it has an absolute right to have cases involving federal tax liens determined in a federal forum, *see* United States' Mem. Opp'n at 4–6, and in oral argument went so far as to say that the Commonwealth's invocation of the Eleventh Amendment must give way to that right. Although the United States, pursuant to 28 U.S.C. §§ 1444 and 2410, properly removed this action to federal court, its right to remove does not—and cannot—preclude the Commonwealth from raising its assertion of Eleventh Amendment protection. *See Daoust,* 214 F.Supp.2d at 82.

It is well settled that congressional intent to abrogate a state's Eleventh Amendment sovereign immunity must be "unmistakably clear in the language of the statute." *College Savings Bank,* 527 U.S.

at 670, 119 S.Ct. 2219 (citing *Seminole Tribe*, 517 U.S. at 56, 116 S.Ct. 1114). The removal statutes at hand, however, do not rise to this required level of unmistakable clarity. Judges Tauro, Keeton, Zobel, and O'Toole, all in very similar cases, have agreed. *See, e.g., First Fed. Sav. Bank of Am. v. Ward*, No. 03–10168 (D.Mass. Oct. 7, 2003) (O'Toole, J.) (granting motion to dismiss, on grounds that 28 U.S.C. §§ 1444 and 2410 do not abrogate the Commonwealth's sovereign immunity) (appeal pending); *Fleet Nat'l Bank v. Kaplan*, 2002 WL 31934187 at 1, No. 02–11175, 2002 U.S. Dist. LEXIS 22781, at *2 (D.Mass. Oct. 11, 2002) (Zobel, J.) (holding that the federal government's rights under 28 U.S.C. §§ 1444 and 2410 do "not present a situation in which the Commonwealth's sovereign immunity has been abrogated with 'unequivocal statutory language' or waived"); *Chase Bank of Tex. Nat'l Ass'n v. Brockman*, No. 02–11253, 2002 U.S. Dist. LEXIS 22780, at *2 (D.Mass. Oct. 10, 2002) (Zobel, J.) (same); *Cape Ann Savings Bank*, 2002 WL 1839248 at 1, 2002 U.S. Dist. LEXIS 15282, at *4 (holding that 28 U.S.C. §§ 1444 and 2410 do not abrogate state sovereign immunity because they "fail[ ] to surmount the hurdle erected by *Seminole Tribe* "); *Daoust*, 214 F.Supp.2d at 82 (holding that 28 U.S.C. §§ 1444 and 2410 lacked the requisite clarity, and therefore, "these statutes cannot be read as trumping the Commonwealth's immunity"); *EMC Mortgage Corp. v. Stadelmann*, 127 F.Supp.2d 249, 251 (D.Mass. 2000) (Tauro, J.) (noting that "sections [1444 and 2410, as well as 26 U.S.C. § 7403] do not, explicitly or implicitly, discuss the abrogation of states' sovereign immunity in suits brought by private parties," and holding that "the 'structural in-

terplay' of the various code sections cited ... does not rise to the required level of unmistakable clarity").[4] There is, therefore, no basis to conclude that the removal statute abrogated the Commonwealth's state sovereign immunity in this case.

The United States seeks to bolster its argument by pointing out that Congress has expressly conditioned the federal government's waiver of immunity in cases like this one on the power to remove. United States' Mem. Opp'n at 6–7 (citing 28 U.S.C. § 2410, *Hood v. United States*, 256 F.2d 522, 526 (9th Cir.1958), *E.C. Robinson Lumber Co. v. Hughes*, 355 F.Supp. 1363, 1367–68 (E.D.Mo.1972) (collecting cases), and *Hamlin v. Hamlin*, 237 F.Supp. 299, 300 (N.D.Miss.1964)). There is no avenue, however, from this uncontroversial proposition to the abrogation of the Commonwealth's sovereign immunity.

If this Court can dismiss the Commonwealth as a party and still adjudicate the interpleader action, then no violence has been done to the United States' right to have this case adjudicated in federal court. If, on the other hand, federal courts are unable to adjudicate interpleader actions where a nonconsenting state is a necessary party, and the United States is thus effectively precluded from removing interpleader actions where the Commonwealth is a necessary party, the United States can still exercise its rights. Specifically, under such circumstances, if the United States were sued in interpleader in the Commonwealth's courts (or if a federal court were compelled to remand to state court), the United States could itself assert sovereign immunity, and the state court would likely have to dismiss the United States as a party (assuming no waiver, etc.). In other

---

4. The *EMC Mortgage* case, although commenced in the United States district court rather than being removed to it, was also an interpleader action brought by a private individual, with both the Commonwealth and the United States as defendants.

words, if the condition precedent for the United States' waiver of immunity is not present, then the waiver is inoperative, and the United States may simply exercise its prerogative not to consent to suit.

It could be imagined that, in circumstances where an interpleader action involving both the United States and the Commonwealth cannot proceed in federal court, the result would be that a private individual cannot resolve the status of property in its possession through interpleader. The Court does not in fact so hold, but if it were to do so, that unfortunate consequence of sovereign immunity would hardly be unprecedented. In *Cory v. White*, 457 U.S. at 90, 102 S.Ct. 2325, for example, the plaintiff sought a determination of Howard Hughes's domicile to resolve which of two states was entitled to levy certain taxes on his estate, but the Supreme Court held that the Eleventh Amendment prohibited the Hughes estate from doing so.

### c. Waiver of Sovereign Immunity

 Lastly, the United States contends that the Commonwealth, by waiving its immunity to be sued in *state court* interpleader actions, has waived its Eleventh Amendment immunity in *federal court*. *See* United States' Mem. Opp'n at 13; *id.* at 15 (arguing that "where the Superior Court had jurisdiction in the first instance to adjudicate claims against the Commonwealth, removal by the United States ... neither alters nor revises the underlying state-law waiver of the Commonwealth's immunity"). The Court notes that the question whether a state's laws or conduct have waived its sovereign immunity is one of federal law. *Lapides v. Bd. of Regents of the Univ. Sys. of Georgia*, 535 U.S. 613, 622–23, 122 S.Ct. 1640, 152

L.Ed.2d 806 (2002). The United States appears to approach its waiver argument in two ways, neither of which this Court finds convincing.

First, the United States appears to argue that the Commonwealth, by consenting without limitation to state court interpleader suits, which would obviously sometimes include the United States as a party, and in which the United States has the right to remove, has consented to removal of such actions to federal court. The argument is circular, however. It maintains that the Commonwealth has waived its immunity because it knew or should have known that, once it consented to suit in state court, it would be precluded from invoking its sovereign immunity should the United States be a co-defendant and remove the case to federal court. Yet the Commonwealth's ability to invoke its sovereign immunity in such circumstances is precisely the question that needs to be answered here. The United States cannot circumvent this difficult question by assuming what it seeks to prove, and then arguing that the Commonwealth waived its immunity from suit in federal court by waiving state court immunity.

Indeed, even if this Court had concluded that 28 U.S.C. §§ 1444 and 2410 have abrogated the Commonwealth's immunity, that result would not have been sufficiently obvious and predictable to justify application of the United States' first waiver theory.[5] The Supreme Court has held that states can only waive their immunity through unequivocal statements or conduct. A statute specifically consenting to federal court suit would suffice, as would a state's voluntary invocation of federal

---

**5.** Obviously, had the Court so decided, it would not have needed to reach the question of waiver.

court jurisdiction. *See College Savings Bank*, 527 U.S. at 675–76, 119 S.Ct. 2219 (noting that a state cannot waive its federal court immunity by merely consenting to suit in state court, stating an intention to "sue and be. sued," or authorizing suit against it "in any court of competent jurisdiction") (citations and internal quotation marks omitted); *Edelman v. Jordan*, 415 U.S. 651, 673, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974) ("[W]e will find waiver only where stated by the most express language or by such overwhelming implications from the text as [will] leave no room for any other reasonable construction." (quoting *Murray v. Wilson Distilling Co.*, 213 U.S. 151, 171, 29 S.Ct. 458, 53 L.Ed. 742 (1909)) (alteration in original) (internal quotation marks omitted)). *Lapides*, which the United States cites, provides an example of unequivocal waiver through litigation conduct: when a state joined in a petition to remove a case to federal court, it could not later invoke the Eleventh Amendment to bar federal court adjudication of that particular case, because it had clearly consented to federal court jurisdiction. 535 U.S. at 624, 122 S.Ct. 1640.[6] The Commonwealth's consent to state court jurisdiction, under circumstances where the law governing its amenability to suit in an action removed to federal court by the United States was murky at best, hardly rises to the level of unequivocal consent that the Supreme Court requires.

The United States not only believes that a less-than-clear statement can waive sovereign immunity; it goes further. It argues that the Commonwealth would have to make a clear statement *refusing* to consent to federal jurisdiction before it could invoke sovereign immunity. *See* United States' Mem. Opp'n at 13 (noting that there is "no such limitation expressly set forth in any statute waiving the Commonwealth's immunity," and arguing that consent to federal jurisdiction is "the necessary implication of the Commonwealth's waiver [of state court immunity in interpleader actions] . . ., in the absence of an express statutory limitation on the Commonwealth's waiver"). This Court's discussion of the Supreme Court's waiver jurisprudence has already established that this is not the law.

In a second waiver argument, the United States offers a variation on the principle of "derivative jurisdiction," that is, the principle that a case is only properly removable if the state court from which it is removed had personal and subject matter jurisdiction, and that when removed cases involve only state law claims, the court must apply the state's substantive law. *Id.* at 14. The United States cites *Arizona v. Manypenny*, 451 U.S. 232, 101 S.Ct. 1657, 68 L.Ed.2d 58 (1981), and *Minnesota v. United States*, 305 U.S. 382, 59 S.Ct. 292, 83 L.Ed. 235 (1939), to support its arguments. *Manypenny* involved a federal officer who, when the State of Arizona commenced a state-law criminal prosecution against him in state court, removed to federal court under 28 U.S.C. § 1442(a)(1). *See Manypenny*, 451 U.S. at 233, 101 S.Ct. 1657. The Supreme Court held that, in

---

**6.** *See also Gardner v. New Jersey*, 329 U.S. 565, 574, 67 S.Ct. 467, 91 L.Ed. 504 (1947) (holding that a state had waived its immunity regarding adjudication of a claim it had filed in a bankruptcy proceeding); *Gunter v. Atlantic Coast Line R. Co.*, 200 U.S. 273, 284, 26 S.Ct. 252, 50 L.Ed. 477 (1906) ("where a state voluntarily becomes a party to a cause, and submits its rights for judicial determination, it will be bound thereby, and cannot escape the result of its own voluntary act by invoking the prohibitions of the 11th Amendment"); *Clark v. Barnard*, 108 U.S. 436, 447, 2 S.Ct. 878, 27 L.Ed. 780 (1883) (holding that a state's voluntary appearance in federal court as an intervener avoided any Eleventh Amendment inquiry).

such circumstances, "the invocation of removal jurisdiction ... does not revise or alter the underlying [substantive] law to be applied." *Id.* at 242, 101 S.Ct. 1657. In *Minnesota,* a state brought a condemnation proceeding in state court, involving property in which the United States had an interest. 305 U.S. at 386, 59 S.Ct. 292. The state court lacked subject matter jurisdiction, because such cases had to include the United States a party, and the United States had only consented to such suits in federal court. *Id.* at 387–88, 59 S.Ct. 292. The case was removed to federal court. *Id.* at 384, 59 S.Ct. 292. The Supreme Court held that the removal court had to dismiss the case, even though it would have had jurisdiction had the action been filed in federal court, because the removal court's jurisdiction was "derivative" of the state court's jurisdiction.[7]

The United States argues that under *Manypenny,* "where ... relevant state-court jurisdiction is found to exist and the question is whether the federal court in effect loses such jurisdiction as a result of removal," the answer is "no." *See* United States' Mem. Opp'n at 14–15 & n. 8 (citing *Manypenny,* 451 U.S. at 242 n. 17, 101 S.Ct. 1657). As support for this reading, it cites *International Primate Protection League v. Administrators of Tulane Educ. Fund,* 500 U.S. 72, 111 S.Ct. 1700, 114 L.Ed.2d 134 (1991), which reserved for another day the question whether a federal court in an action removed under 28 U.S.C. § 1442(a)(1) could require plaintiffs to meet the federal Constitution's standing requirements with respect to state law

claims. United States' Mem. Opp'n at 15 n.8 (citing *International Primate* at 78 n. 4, 111 S.Ct. 1700). Thus, the argument goes, if Massachusetts substantive law permits the Commonwealth's courts to adjudicate interpleader actions against the Commonwealth, a federal court can and must apply that substantive law upon removal, and the Commonwealth can no more assert its sovereign immunity here than it could in its own courts.

■ The most obvious problem with this argument is that it proves far too much. The Supreme Court has made quite clear that a state may consent to suit in its own courts without extending that consent to federal courts. *See College Savings Bank,* 527 U.S. at 675–76, 119 S.Ct. 2219. Yet, in virtually any class of cases for which the Commonwealth might consent solely to suit in its own courts, removal will be possible, and by the United States' argument, that possibility will transform consent to state court suit into consent to federal court suit. *College Savings Bank* and the cases it cites thus demonstrate that the United States' argument cannot be right.

There are at least two ways to look at why the United States' argument here does not work. First, the Court could look to the rationale of *Manypenny.* The only purpose of permitting the federal defendant to remove was to ensure a hearing in a federal forum (not to undermine or preempt state criminal law) and to enforce the federal statute with as little prejudice

---

7. The result in *Minnesota* has been effectively mooted by the 1986 amendment of 28 U.S.C. § 1441 to add subsection (e), which provides that upon removal in diversity and federal question cases, the federal court will have jurisdiction, even if the state court did not. This statutory amendment did nothing to impact the continuing vitality of the Supreme Court's derivative jurisdiction jurisprudence,

however. *See International Primate Protection League v. Administrators of Tulane Educ. Fund,* 500 U.S. 72, 78 n. 4, 111 S.Ct. 1700, 114 L.Ed.2d 134 (1991) (assuming that this jurisprudence was still applicable). Rather, as the United States correctly asserts, Section 1441(e) merely expands the federal courts' jurisdiction to erase one restrictive result of that jurisprudence.

to the state's prerogatives as possible. *Manypenny*, 451 U.S. at 241–42, 101 S.Ct. 1657. Here, adjudicating the dispute in the same way as in the state court would not preserve the Commonwealth's prerogatives, but rather destroy them. The United States relies on a decision showing great solicitude for the rights of a state in a federal system for its argument that this Court should simply disregard those rights.

Second, and more important, even if the appropriate course is blindly to apply *Manypenny* to state sovereign immunity cases, with no consideration of the special aspects of Eleventh Amendment jurisprudence, the Commonwealth's substantive law in fact holds that while interpleader suits against it can proceed in state court, they cannot in federal court. A federal court that dismissed the Commonwealth as a party would thus still be applying Massachusetts law, as *Manypenny* requires it to do. Dismissing the Commonwealth as a party would be quite different from the lower court's actions in *Manypenny*, where the federal court sought to deny a state a right it would have had in the state court system because the federal court wished to apply *federal* law.

*Manypenny* and *Minnesota* are more about choice of law than about judicial power. It is true that the powers of state courts and removal courts were congruent in those cases, but that was because state substantive law produced the same result, regardless of which forum applied it. In

neither case was there any relevant federal jurisdictional bar. Assuming removal is proper, there are exceptionally few cases where a state court could exercise personal jurisdiction and subject matter jurisdiction, but where upon removal, a federal court could not exercise them. Eleventh Amendment cases like this one, however, are among those few.

The Eleventh Amendment's limitation on the power of federal courts is apparently a hybrid of a personal jurisdictional bar (insofar as states can consent to jurisdiction or waive objections thereto, and a court need not raise an objection *sua sponte* ) and a subject matter jurisdictional bar (insofar as a sovereign immunity defense can be raised at any point in the proceedings). *See Wisconsin Dept. of Corr. v. Schacht*, 524 U.S. 381, 394–95, 118 S.Ct. 2047, 141 L.Ed.2d 364 (1998) (Kennedy, J., concurring) (describing these aspects of the Supreme Court's Eleventh Amendment jurisprudence and suggesting that the Court should perhaps revise its Eleventh Amendment doctrine more closely to mirror personal jurisdiction practice); *see also* Caleb Nelson, *Sovereign Immunity as a Doctrine of Personal Jurisdiction*, 115 Harv. L.Rev. 1561 (2002) (arguing that the Eleventh Amendment was in fact intended purely to be a personal jurisdictional bar, not a subject matter jurisdictional bar). *But see Schacht*, 524 U.S. at 391, 118 S.Ct. 2047 (asserting in dicta that the Supreme Court has not decided whether "Eleventh Amendment immunity is a matter of subject-matter jurisdiction").[8] The

---

8. Several Supreme Court cases have treated the Eleventh Amendment more as a doctrine of subject matter jurisdiction. *See Edelman v. Jordan*, 415 U.S. 651, 678, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974) (awarding a state relief from the portion of a district court judgment requiring retroactive payment of benefits wrongfully withheld, based on an Eleventh Amendment defense that the state did not assert until it was actually before the Supreme Court); *Ford Motor Co. v. Dept. of Treasury of Indiana*, 323 U.S. 459, 467, 65 S.Ct. 347, 89 L.Ed. 389 (1945) ("The Eleventh Amendment declares a policy and sets forth an explicit limitation on federal judicial power of such compelling force that this Court will consider the issue arising under this Amendment in this case even though urged for the first time in this Court."); *see also Calderon v. Ashmus*, 523 U.S. 740, 745 n. 2,

law is migrating in the direction of treating the Eleventh Amendment more purely like a personal jurisdiction doctrine. *See La-pides*, 535 U.S. at 623, 122 S.Ct. 1640 (partially overruling *Ford Motor Co. v. Department of Treasury of Indiana*, 323 U.S. 459, 65 S.Ct. 347, 89 L.Ed. 389 (1945), to the extent that it permitted a state to raise an Eleventh Amendment defense after it had authorized its attorney general to invoke federal court jurisdiction). It does appear, given Justice Kennedy's articulated concerns, Justice Stevens's views (*see Federal Maritime Commission*, 535 U.S. at 770–72, 122 S.Ct. 1864 (Stevens, J., dissenting)), and the obvious desire of Justices Stevens, Souter, Ginsburg, and Breyer to place limits on the Eleventh Amendment (*see, e.g., Alden*, 527 U.S. at 760–814, 119 S.Ct. 2240 (Souter, J., dissenting, joined by Justices Stevens, Ginsburg, and Breyer)), that there are now five Supreme Court justices just waiting for the right case to complete the migration.

Whatever the mix of personal and subject matter jurisdictional elements in the Eleventh Amendment, cases where a state has consented to private suit in state court, but not in federal court, present a unique circumstance in which removal introduces a subject-matter/personal jurisdictional bar applicable to the federal court, but not to the state court from which the case was removed. The addition of this element makes *Manypenny* distinguishable in an

important way, and thus destroys the congruence that would otherwise exist between the powers of a state court and of a federal court hearing a case removed from state court.

The *International Primate* footnote is consistent with this conception. The rationale behind applying the state law of standing to state-law claims asserted in a case removed to federal court was that a defendant should not be able to use removal to prevent adjudication of claims that a state intended to have adjudicated. In this case, however, the Commonwealth does not intend to have private interpleader claims against it adjudicated, if adjudication takes place in federal court. Thus, the federal court does no violence to state law by refusing to do something that an identically situated state court would do.

### 2. The Commonwealth as an Indispensable Party

The Commonwealth claims that it is an "indispensable party" under Rule 19(b) of the Federal Rules of Civil Procedure, and that because the Eleventh Amendment requires the Court to dismiss the Commonwealth as a party, Rule 19(b) mandates dismissal of the entire action for "failure to join an indispensable party." Mot. to Dismiss.[9]

#### a. Standards Under Rule 19

■ The question whether the Commonwealth is an indispensable party is

118 S.Ct. 1694, 140 L.Ed.2d 970 (1998) (noting that an Eleventh Amendment defense may be raised at any stage of the proceedings). As the Court notes *infra* at 22–23, *Lapides* has eroded the vitality of these cases.

9. Another possible route to remand was recently rejected in *Schacht*. In that case, the state argued that because the Eleventh Amendment is at least partially a subject matter jurisdictional bar, 28 U.S.C. § 1447(c), which requires remand of removed cases "if at any time before final judgment it appears that the district court lacks subject matter

jurisdiction," mandates remand of any case where one of the claims is against a state that has properly objected to suit in federal court. *Schacht*, 524 U.S. at 391, 118 S.Ct. 2047. Refusing to reach the question whether and to what extent the Eleventh Amendment is a doctrine of subject matter jurisdiction, the Supreme Court interpreted this provision to require remand only when a court lacks subject matter jurisdiction over the entire case, not merely over one of the claims. *Id.* at 391–92, 118 S.Ct. 2047.

governed by Rule 19 of the Federal Rules. Fed.R.Civ.P. 19(a)-(b). As then-Judge Breyer said: "In applying Rule 19—a Rule that comes freighted with history—we must keep in mind the fact that this Rule seeks to accomplish a practical objective." *Pujol v. Shearson Am. Exp., Inc.*, 877 F.2d 132, 134 (1st Cir.1989) (citing *Provident Tradesmens Bank & Trust Co.*, 390 U.S. 102, 106–07, 120–25, 88 S.Ct. 733, 19 L.Ed.2d 936 (1968), *Pulitzer–Polster v. Pulitzer*, 784 F.2d 1305, 1309 (5th Cir. 1986), *Schutten v. Shell Oil Co.*, 421 F.2d 869, 874 (5th Cir.1970), Charles Alan Wright, *The Law of the Federal Courts* 458–61 (4th ed.1983), and Geoffrey C. Hazard, Jr., *Indispensable Party: The Historical Origin of a Procedural Phantom*, 61 Colum. L.Rev. 1254 (1961)) (internal citations omitted). The Rule 19 inquiry is thus a pragmatic, case-specific examination of whether resolution of a case in the absence of a particular party comports with the Federal Rules' twin goals of fairness and efficiency. *See id.* at 134–35, and cases and sources cited therein.

This is a two prong inquiry. First, the Court must determine whether the parties to be joined are necessary and whether their joinder is feasible. Fed.R.Civ.P. 19(a). Rule 19(a) requires the Court to join a person[10] in a legal proceeding if:

(1) in the person's absence complete relief cannot be accorded among those already parties, or (2) the person claims an interest relating to the subject of the action and is so situated that the disposition of the action in the person's absence may (i) as a practical matter impair or impede the person's ability to protect that interest, or (ii) leave any of the

persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of the claimed interest.

*Id.*

Then, if a person is a necessary party, but her joinder is not feasible, the Court must use the four "gestalt" factors listed in Rule 19(b) to "determine whether in equity and good conscience the action should proceed among the parties before it, or should be dismissed, the absent person being thus regarded as *indispensable.*" *Id.* at 19(b) (emphasis added). The factors to be considered by the Court are:

[f]irst, to what extent a judgment rendered in the person's absence might be prejudicial to the person or those already parties; second, the extent to which, by protective provisions in the judgment, by the shaping of relief, or other measures, the prejudice can be lessened or avoided; third, whether a judgment rendered in the person's absence will be adequate; fourth, whether the plaintiff will have an adequate remedy if the action is dismissed for nonjoinder.

*Id.*

### b. Application of Rule 19

The Commonwealth is a necessary party in that any disposition in its absence could possibly subject Horizon—and any recipient[11] of the proceeds of the foreclosure sale at issue here—to a substantial risk of "incurring double, multiple or otherwise inconsistent obligations." *See* Commonwealth's Mem. Supp. [Doc. No. 6] at 6 (arguing that "[i]f this action were to

---

**10.** It is beyond question that the term "person" in the Federal Rules includes governments. *See; e.g., Idaho ex. rel. Evans v. Oregon*, 444 U.S. 380, 100 S.Ct. 616, 62 L.Ed.2d 564, *passim* (1980) (assuming tacitly that the term "person" in Rule 19 applies to the federal government).

**11.** Except for the United States. *See infra* at 29–31.

continue without the Commonwealth, the parties would proceed at their own peril because the state tax liens would not[ ] necessarily be discharged, leaving both the plaintiff and any recipient of the interpleader funds potentially liable to the Commonwealth"). The question remains, though, whether the Commonwealth is an indispensable party, without whom this action cannot proceed.

Judges Zobel and Keeton, confronting virtually identical scenarios, refused to dismiss the entire action for failure to join the Commonwealth. According to Judge Zobel, "[t]his Court can lessen or avoid any prejudice to the Commonwealth by giving it notice of further proceedings and an opportunity to file briefs as *amicus*. Moreover, [the plaintiff] will not have an adequate remedy if the action is dismissed for nonjoinder." *Fleet National Bank*, 2002 WL 31934187 at 1, 2002 U.S. Dist. LEXIS 22781, at *2–3 (internal citation omitted); *accord Chase Bank*, 2002 U.S. District LEXIS 22780, at *3; *Daoust*, 214 F.Supp.2d at 83–84.

Judge O'Toole, on the other hand, held that this conundrum *does* warrant dismissal of the entire action. *See e.g., Cape Ann*, 2002 WL 1839248 at 1–2, 2002 U.S. District LEXIS 15282, at *4–5. In a recent order, Judge O'Toole ruled that:

[T]o permit the Commonwealth to intervene or participate as amicus—is simply to pressure the Commonwealth to do what it objects to doing (rightly under the Eleventh Amendment), that is, to participate in the adjudication of the claims in a federal court. If the Commonwealth is justified in invoking the Eleventh Amendment to opt out of federal adjudication of claims touching its interests, it is hardly an "accommodation" to the Commonwealth to say that it can participate if it wants to. The Commonwealth has already said it does not

want to. To threaten to adjudicate the claims without the Commonwealth, that is, to say that it may come out the loser unless it surrenders its sovereign immunity objection and "volunteers" to participate in some way, seems to me a way of coercing the Commonwealth out of its Eleventh Amendment right to resist adjudication of claims against it in a federal court.

*First Federal Savings*, No. 03–10168. There is much to be said for this reasoning. This Court has determined, however, that it is in fact possible to address the concerns expressed in the *First Federal Savings* order without dismissing this entire case. The Court will thus attempt to lay out a framework for analyzing cases of this sort, which as the citations in this opinion make clear, arise with some frequency in this district.

### (1) The Gestalt Factors

Under the first "gestalt" factor, the Court must determine "to what extent a judgment rendered in the [Commonwealth's] absence might be prejudicial to the person or those already parties." Fed. R.Civ.P. 19(b). This inquiry is especially complex when the necessary party is a state invoking its sovereign immunity, because it is by no means obvious what preclusive effect a judgment rendered in its absence would have. This Court must therefore explore this somewhat abstract legal question in order to determine what the practical consequences of a judgment on the merits would be. The Court will first explore issues of preclusion as between the Commonwealth and the United States, and will then explore such issues as between the Commonwealth and the other parties.

The Commonwealth and the United States have a unique relationship in interpleader actions naming both of them as

defendants. This Court has already determined that Horizon's interpleader claim against the Commonwealth cannot proceed in federal court, regardless of the United States' actions. The distinction between the interpleader context and the cases where the federal government was permitted to implead a nonconsenting state makes the latter inapplicable.

 There is no question, however, that the federal government can sue state governments to vindicate its interests. *See, e.g., United States v. Mississippi*, 380 U.S. 128, 140, 85 S.Ct. 808, 13 L.Ed.2d 717 (1965); *United States v. Texas*, 143 U.S. at 641–45, 12 S.Ct. 488.[12] The Supreme Court has given no indication that it intends to extend its recent Eleventh Amendment decisions so far as to chip away at or eliminate the longstanding rule that the Eleventh Amendment does not prevent sovereigns in our federal system from suing one another to vindicate their interests. *See Kansas v. Colorado*, 533 U.S. 1, 7, 121 S.Ct. 2023, 150 L.Ed.2d 72 (2001) (reaffirming that a state may sue another state for money damages without violating the Eleventh Amendment, so long as the state is not "merely acting as an agent or trustee for one or more of its citizens").

 It is clear, therefore, that were the Commonwealth not a party to this action in the first place, the United States could join the Commonwealth as a party, solely for the purpose of resolving the relative right the two parties have to the funds in question (assuming no justiciabili-

ty bars, etc.). *See* 26 U.S.C. §§ 7401–03 (describing the broad powers of the United States and of federal courts in tax-related cases). Were the United States to bring the Commonwealth into the action in such a way, the only aspect of any judgment that would have preclusive effect against the Commonwealth would be a determination as to the relative priority of the two sovereigns. The Commonwealth would remain free to sue the interpleader plaintiff or any interpleader defendants other than the United States.

Similarly, there is no reason why the United States could not cross-claim against the Commonwealth in this interpleader action, seeking resolution of the question of the sovereigns' relative entitlement to the funds. *See id.* Neither cross-claims of this sort nor the joinder discussed above would be meaningfully distinguishable from the cases where the federal government was permitted to implead a state otherwise entitled to invoke its sovereign immunity. There, as here, the only question regards an economic dispute between two sovereigns.[13]

The United States has not in fact cross-claimed in this case, but the Court does not consider it appropriate to require the United States to file such a cross-claim. Given the unsettled nature of the law governing cases like this one and the novelty of filing cross-claims in interpleader, the Court did not expect the United States to file a cross-claim in this case. Cross-claims regarding the central matter of an interpleader case are obviously rare, if not

---

12. This Court need not delve into questions regarding the extent to which the United States may bring actions to recover on behalf of private citizens, as the interest involved in this case is purely the United States' own.

13. One can see the equivalence between the cross-claim and joinder situations by imagining what would happen if the Court were to

dismiss the Commonwealth as a party, rather than keeping it in the action for the sole purpose of resolving a United States cross-claim against it. The United States could then simply join the Commonwealth after the Court dismissed it as a party, and thus reach the exact same procedural posture.

unheard of, precisely because a judgment in the case typically will resolve any claims as between any two parties. Instances where a court has jurisdiction to resolve some claims involving a particular interpleader defendant, but not others, are similarly rare.

It is conceivable that the United States might not be required to file a cross-claim against the Commonwealth to obtain interpleader relief, even in future similar cases. The idea of interpleader is that all parties with a possible claim to property resolve their relative claims vis-a-vis one another. Although there are, strictly speaking, interpleader plaintiffs and defendants, in reality each party is both a defendant against the other parties' claims to the property and a plaintiff seeking to assert superior title as against all the other parties. Thus, it might be reasonable to regard interpleader cases like this one as a web of claims, with strands connecting each party to all of the others. A court could perhaps sever all of the strands leading to the Commonwealth except for the one connecting it and the United States, and resolve that claim without the United States' having to file a cross-claim.[14]

In any case, now that the United States is on notice as to how this Court intends to treat cases like this one, it may obviously determine for itself whether it wishes to present the question of the necessity of a cross-claim in a future case, or instead to avoid the question altogether by filing cross-claims against the Commonwealth as a matter of course.

Now that the Court has determined that it can properly resolve claims as between the United States and the Commonwealth, the question remains as to what preclusive effect a judgment would have as between the Commonwealth and the other parties. If the Court were to decide the entire case here, there would presumably be no preclusion as between the Commonwealth and the nongovernmental parties. Any other result would be inconsistent with the Eleventh Amendment. Granting the Commonwealth's request to be dismissed as a party and then giving preclusive effect (as between the Commonwealth and any of the nongovernmental parties) to any judgment resulting from this case would be no different from permitting private individuals to obtain default judgments against the Commonwealth.[15]

14. Even if a court refused to afford the federal government relief in the absence of a cross-claim, it might well have to permit the federal government an opportunity to join the Commonwealth as a party (for the limited purpose of determining the two sovereigns' priority).

15. The apparent fate of 11 U.S.C. § 106, which governs the application of sovereign immunity in bankruptcy cases, suggests that the Court's preclusion analysis is correct. Bankruptcy is in many ways analogous to interpleader, seeking to resolve in one case all claims to an interest in property (the bankruptcy estate, in the bankruptcy context). At one point, a plurality of the Supreme Court assumed that a bankruptcy court's discharge of a debtor's debts, including unpaid taxes, would bind states that had failed to file a proof of claim. *Hoffman v. Connecticut Dept.*

*of Income Maint.*, 492 U.S. 96, 102, 109 S.Ct. 2818, 106 L.Ed.2d 76 (1989) (plurality opinion) (stating as much while holding that the Bankruptcy Code did not authorize monetary recovery from unconsenting states). This was before the *Seminole Tribe* decision, and at least one of the Justices dissenting in that decision assumed that it made that portion of *Hoffman* obsolete. *See Seminole Tribe*, 517 U.S. at 90 & n. 12, 116 S.Ct. 1114 (Stevens, J., dissenting). If Congress has no power under Article I to subject a state to default judgments, even when such judgments would not diminish the state's treasury, this Court cannot see how the Eleventh Amendment can permit it to accomplish the same result by other means.

Even if that portion of *Hoffman* does survive, it is most likely because, to the extent that the Eleventh Amendment is a personal

If a judgment in this case does not preclude the Commonwealth from pursuing its rights against the private party plaintiff and defendants in its own courts, and if the United States has a right to judgment in this Court, it is difficult to see how any prejudice could result to the Commonwealth, should the Court proceed to judgment in this case. Indeed, it seems that generally, in interpleader actions involving property in which the federal government and a state government both claim an interest, proceeding to judgment in the state's absence will not prejudice the state's interests, at least in any way that the state is entitled to avoid.

■■■ There remains the question of prejudice to the other parties. The Court expects they would all agree that a federal court judgment that leaves them open to later claims by the Commonwealth is undesirable. The Court, however, cannot find a less prejudicial option. In this case, proceeding to judgment is in fact the least prejudicial option.

One alternative to federal court adjudication, remand to state court for a final judgment there, produces virtually the same problems as would a federal court judgment. A remand would in essence constitute a holding that the United States cannot remove the interpleader action. Because the United States has conditioned its waiver of sovereign immunity on the right to remove, the United States would presumably be entitled to invoke its own sovereign immunity and get itself dismissed as a party. *See supra* at 185–86.

Admittedly, the sovereign immunity analysis for the federal government and for states is not always identical. *Lapides,* 535 U.S. at 623, 122 S.Ct. 1640. Still, it is fairly clear that granting a state court interpleader judgment preclusive effect against the United States is no more consistent with the concept of sovereign immunity than would be enforcement of a similar federal court judgment against the Commonwealth. Even assuming (without deciding) that the Commonwealth has the same power to compel resolution of its claims against the United States that the United States has against the Commonwealth, it still cannot be said that federal court adjudication is likely to produce a less adequate judgment than remand.

The other option is to dismiss the case. This option is plainly inferior to a judgment in one court (federal or state), which would resolve the private parties' relative claims as against one another and as against one of the sovereigns, and would clarify the comparative claims of the two sovereigns. Out of the manifold combinations of relative claims, the only ones remaining unresolved in such a judgment would be those between the private individuals and one of the sovereigns. At worst, there might be a second lawsuit in that sovereign's courts. In the case of dismissal, however, no claims whatsoever can be resolved. Each party acts at its peril, subject to lawsuits by any one of the other parties. Whatever evils proceeding to judgment or remanding might produce, dismissal of the entire case multiplies them

jurisdiction doctrine, a state that had notice of the proceedings but failed to file a notice of claim would have waived any objection to discharge, whereas an objection to the bankruptcy court's jurisdiction would insulate the state from any binding effect of the discharge. The Sixth Circuit recently went even further, holding that Congress can abrogate state sovereign immunity under the Bankruptcy Clause, because it constitutes a constitutional compact between the states authorizing Congress to make a "uniform" bankruptcy law. *Hood v. Tennessee Student Assistance Corp.,* 319 F.3d 755, 758 (6th Cir.2003), *cert. granted* —— U.S. ——, 124 S.Ct. 45, 156 L.Ed.2d 703 (2003). Even if *Hood* is correct, however, there is no equivalent compact for interpleader cases.

several-fold. This is clearly a case where incomplete relief is better than no relief at all.

Analysis of the second factor in cases like this thus comes down to a determination whether judgment should issue from a federal court or from a state court. Although, as an abstract matter, the state and federal fora are equivalent, there may well be cases where resolution in one forum would be more adequate. Examples may include cases where one or the other sovereign's claim is disproportionately larger than the other's, or where one sovereign's claim is particularly easily resolved. In this case, the facts and law are sufficiently clear that proceeding to judgment in this Court will likely produce no prejudice to any party. Moreover, because the United States has priority over the Commonwealth, *see infra* at 45–47, resolving the United States' claim may well make it difficult for the Commonwealth to subject the private individuals in this case to inconsistent obligations in later proceedings.[16] Were the order of priority similarly clear, but reversed, this factor might weigh in favor of remand.

The second factor this Court must consider is "the extent to which, by protective provisions in the judgment, by the shaping of relief, or other measures, the prejudice can be lessened or avoided." Fed.R.Civ.P. 19(b). The Court has already determined that no undue prejudice to the Commonwealth is apt to result. The Court can only reemphasize its understanding of the limits on the preclusive effect that any judgment would have in future proceedings by the Commonwealth against the nongovernmental parties and state again

that the partial relief afforded is better than nothing.

The Court must next consider the third factor, that is "whether a judgment rendered in the [Commonwealth's] absence will be adequate." Fed.R.Civ.P. 19(b). This factor involves "the interest of the courts and the public in complete, consistent, and efficient settlement of controversies." *See Provident Bank*, 390 U.S. at 111, 88 S.Ct. 733. In cases like this one, the public interest aligns with the private parties' interests. In particular, proceeding to judgment in this case provides the most complete and efficient resolution of the controversy that is possible, with less danger of inconsistency than any other available course of action.

Similarly, under the fourth factor, "whether the plaintiff will have an adequate remedy if the action is dismissed for nonjoinder," Fed.R.Civ.P. 19(b), this Court has determined that dismissal will leave Horizon with no adequate remedy. Should this Court dismiss or remand, the only option left to Horizon is to proceed in state court. Particularly given this Court's determination that federal court can provide more complete resolution than state court in this case (because of the United States' priority over the Commonwealth), a Massachusetts court might refuse to proceed to judgment. Massachusetts Rule of Civil Procedure 19(b) follows the federal rule, although its relation to earlier state law equity practice may occasionally lead to results different than the federal rule. *See* Mass. R. Civ. P. 19 Reporters' Notes (1973). If this Court were to determine that the equities weighed against proceed-

---

**16.** This speculation is not inconsistent with the Court's earlier determination that proceeding to judgment would not prejudice the Commonwealth. The United States has a right to obtain a federal court determination of its rights relative to the Commonwealth in the funds at issue here. The Commonwealth has no right to avoid whatever preclusive effect such a judgment would have, whether it occurs in a bilateral proceeding or as a result of judgment in this case.

ing to judgment, the equities would weigh even more heavily against a state court judgment. If neither state nor federal courts were willing to issue an interpleader judgment, Horizon would have to disburse the funds at issue at its own risk, potentially subjecting itself to multiple subsequent lawsuits and inconsistent judgments.

It is true that interpleader is sometimes simply not available to private citizens seeking to resolve two sovereigns' conflicting claims to property in his possession. *See, e.g., Cory*, 457 U.S. at 90, 102 S.Ct. 2325. Indeed, it is important for the Court to determine why *Cory* does not prevent the Court from ruling on the relative priority of the United States and the Commonwealth, and on the rights of all parties other than the Commonwealth vis-a-vis each other. Put another way, why did the Supreme Court refuse to resolve the relative claims of California and Texas to entitlement to levy certain taxes against the Hughes estate?

The first answer is that the Supreme Court in fact permitted the states to resolve their relative claims through a suit filed under the Supreme Court's original jurisdiction. *See California v. Texas*, 457 U.S. 164, 165, 102 S.Ct. 2335, 72 L.Ed.2d 755 (1982) (granting California's motion for leave to file a complaint). The Supreme Court has original and exclusive jurisdiction over "controversies between two or more States," 28 U.S.C. § 1251, so the lower courts lacked jurisdiction to consider the claim between the two states. That meant that the only claims the lower courts could consider would be those between the Hughes estate and each of the states, and such claims are obviously barred by the Eleventh Amendment. Although the Supreme Court did have original jurisdiction to consider interstate controversies, it could not properly award relief based on such a controversy in a case over which the courts below never properly had jurisdiction.

In this case, the two disputing sovereigns are the federal government and a state government, and district courts have authority to adjudicate controversies between the federal government and a state government. Interpleader in this case thus does not constitute an end run around jurisdictional limitations on federal district courts. In *Cory*, there were no claims that the district court could properly resolve without violating the Eleventh Amendment, but in this case, the Court can resolve all the claims except those between the Commonwealth and private individuals without violating the Eleventh Amendment.

An additional factor that distinguishes this case from *Cory* is the diminished relevance of the Eleventh Amendment as a guide to action. Like other constitutional provisions, the Eleventh Amendment can sometimes serve as a guide to interpretation or to exercise of discretion, even in cases where it does not mandate a particular action. *See, e.g., Gregory v. Ashcroft*, 501 U.S. 452, 460, 111 S.Ct. 2395, 115 L.Ed.2d 410 (1991) (holding that a federal statute should not be interpreted to "upset the usual constitutional balance of federal and state powers," unless Congress has clearly expressed an intent to do so). *Gregory* was arguably something more than a special case of the constitutional avoidance canon. *See Ashwander v. Tennessee Valley Auth.*, 297 U.S. 288, 346–48, 56 S.Ct. 466, 80 L.Ed. 688 (1936) (Brandeis, J., concurring) (providing the most famous statement of the constitutional avoidance canon). *Gregory* suggests that its clear-statement rule involves elements of respect for Congress (who would not lightly alter a balance so central to the constitutional design), and a desire to weight the scales a little bit against the

federal government, which "holds a decided advantage in [the] delicate balance" between state and federal powers. *Id.* at 459–60, 111 S.Ct. 2395.

. In this case the federal interest is much greater than in *Cory,* ,and provides a countervailing consideration to the obvious importance of state governments' prerogatives. *Cory* involved no violations of federal law or of the United States Constitution—it was simply a dispute between two states and an individual who was both a United States citizen and a citizen of at least one of those states. *See Cory,* 457 U.S. at 91, 102 S.Ct.. 2325. Here, the United States is itself a party, seeking to vindicate its own rights. .In such cases, the force of the Eleventh Amendment as a guide to action is diminished, to say the least.

Because the gestalt factors weigh in favor, of proceeding to judgment, and because the case law supports such a course of action, the Court holds that judgment can be entered in this case, but that the judgment has no preclusive effect on the Commonwealth's claim's against. parties other than the United States, except to the extent that those parties are able to make use of the Court's determination that the United States has priority over the Commonwealth.

### B. Giarrusso's Motion for Summary Judgment

As indicated above, the defendant Giarrusso—asserting a priority interest in $264,942.00 of the surplus foreclosure proceeds—has moved for summary judgment. Mot. for Summ. J.

### 1. Standard of Review

Summary judgment is warranted if, after reviewing the facts in the light most favorable to the nonmoving party, *Anderson v. Liberty Lobby, Inc.,* 477 U.S.

242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (citing *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 158–59, 90 S.Ct. 1598, 26 L.Ed.2d 142. (1970)), "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56. A "genuine" issue of fact is one that a reasonable jury, on the record before the court, could resolve in favor of either party. *Anderson,* 477 U.S. at 255, 106 S.Ct. 2505.

The movant has the initial burden of production, which it can meet either by offering evidence to disprove an element of the non-movant's case or, in cases where the non-movant bears the burden of proof, by showing· the absence of evidence to support the non-movant's · case. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once the movant has met this burden, the non-moving party must "go beyond the pleadings and . . . designate specific facts showing that there is a genuine issue for trial." *Id.* at 324, 106 S.Ct. 2548 (internal quotation marks omitted).

### 2. Entitlement to the Foreclosure Proceeds

■ Federal law governs the priority of federal tax liens, even as against a state government's tax liens. *See* 26 ·U.S.C. § 6323 (governing the "[v]alidity and priority [of federal tax liens] against certain persons"); *United States v. Security Trust & Sav. Bank of San Diego,* 340 U.S. 47, 49, 71 S.Ct. 111, 95 L.Ed. ·53 (1950); *see also United States v. Rodgers,* 461 U.S. 677, 683, 103 S.Ct. 2132, 76 L.Ed.2d 236 (1983) (citing with approval the *Security Trust* line of cases); *cf. Clearfield Trust Co. v. United States,* 318 U.S. 363, 366, 63 S.Ct. 573, 87 L.Ed: 838 (1943) (holding that fed-

eral law governs the rights and duties of the United States with regard to commercial paper that it issues).[17] Massachusetts law governs the relative priority of the nongovernmental parties vis-a-vis one another. As it happens, Massachusetts and federal law are in agreement on all relevant points here.

 Under both Massachusetts and federal law, the surplus proceeds of a foreclosure sale pass by equitable lien to junior lienors. *See Pioneer Credit Corp. v. Bloomberg,* 323 F.2d 992, 993–94 (1st Cir. 1963) (citing, *inter alia, Markey v. Langley,* 92 U.S. 142, 23 L.Ed. 701 (1875), *Pilok v. Bednarski,* 230 Mass. 56, 119 N.E. 360 (1918), *Andrews v. Fiske,* 101 Mass. 422 (1869)); *First Colonial Bank for Sav. v. Bergeron,* 38 Mass.App.Ct. 136, 138, 646 N.E.2d 758 (1995). Furthermore, priority among the lienors is determined by the common and oft-repeated principle: "first in time is first in right." *Middlesex Sav. Bank v. Johnson,* 777 F.Supp. 1024, 1027 (D.Mass.1991) (Woodlock, J.) (citing *United States v. New Britain,* 347 U.S. 81, 85–86, 74 S.Ct. 367, 98 L.Ed. 520 (1954)); *East Boston Sav. Bank v. Ogan,* 428 Mass. 327, 329, 701 N.E.2d 331 (1998).

Giarrusso is the priority junior lienholder—its mortgage was recorded well before the United States and the Commonwealth ever filed their liens. *See* Giarrusso's Mem. in Supp.; Compl. ¶¶ 10, 12–13, Ex. B, D, E. Giarrusso's priority is sufficiently clear that the United States has in fact consented to the Motion for Summary Judgment. United States' Response [Doc. No. 25]. Accordingly, Giarrusso's Motion for Summary Judgment is allowed.

### 3. The Remaining Funds

 "[D]istrict courts are widely acknowledged to possess the power to enter summary judgments *sua sponte,* so long as the losing party was on notice that she had to come forward with all her evidence." *Celotex,* 477 U.S. at 326, 106 S.Ct. 2548 (citing 10A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 2720, at 28–29 (1983)). In this case, Giarrusso has filed a Motion for Summary Judgment, demanding most of the funds at issue. This placed the parties on notice that they needed to provide such evidence as would be necessary to survive summary judgment. Based on the records of the United States' and the Commonwealth's tax liens that have already been submitted to the Court, it is difficult to imagine what other evidence any of the parties could submit to create a genuine issue of material fact.

This Court therefore holds, on the undisputed record before it, that the tax liens in favor of the United States arose prior to those of the Commonwealth. On the date of assessment of unpaid internal revenue taxes, a lien arises in favor of the United States in that amount and attaches to all real and personal property and rights to property of the taxpayer, assuming that a notice of the assessment and a demand for payment have been given, coupled with lack of payment in full. 26 U.S.C. §§ 6321 & 6322; *United States v. Murray,* 217 F.3d 59, 60 (1st Cir.2000). Similarly, liabilities owed to the Commonwealth for unpaid income taxes, taxes withheld from employees' salaries and wages, and meals and sales taxes, give rise to liens in favor

---

**17.** Under the modern approach to federal common law questions, a court must first determine whether federal or state law governs, and then, if federal law governs but no federal statute exists, determine whether the court should incorporate state law as the rule of decision. *United States v. Kimbell Foods, Inc.,* 440 U.S. 715, 718, 99 S.Ct. 1448, 59 L.Ed.2d 711 (1979) (applying state commercial law to determine precedence of federal governmental liens under government loan programs over private liens).

of the Commonwealth, following assessment, notice and demand and a failure of payment, as of the date of assessment. Mass. Gen. Laws ch. 62C, § 50(a); *Luchini v. Comm'r of Revenue*, 436 Mass. 403, 406, 764 N.E.2d 870 (2002) (observing that the language and meaning of the Massachusetts tax lien statute are virtually identical to those of the federal Internal Revenue Code); *Middlesex Savings Bank*, 777 F.Supp. at 1027 (holding that the Commonwealth's lien arises on the date of assessment).

▆▆▆ The rule of "first in time, first in right," determines the priority of these competing tax liens, *City of New Britain*, 347 U.S. at 85, and "the priority of each statutory lien contested here must depend on the time it attached to the property in question and became choate," *id.* at 86, 74 S.Ct. 367. For both the United States and the Commonwealth, upon assessment a tax lien becomes choate, because assessment establishes the identity of the lienor, the property subject to the lien (namely, all of the taxpayer's property), and the amount of the lien are established. *See id.* at 84, 74 S.Ct. 367.

Here, the Commonwealth made its first assessment on February 17, 1998, *see* Compl. Ex. E, whereas the United States made its first three assessments on January 23, 1997, February 6, 1997, and June 24, 1997, respectively. Compl. Ex. D & E. As of the Notice of Tax Lien filed on September 14, 2001, the unpaid assessed balances for the United States' three earliest liens (exclusive of accrued and accruing interest and penalties) were $25,802.51, $3,422.53, and $23,446.76, respectively, for a total of $52,671.80. Compl. Ex. D. As a result, the United States has priority over the remaining surplus funds in the amount of $38,211.67. These funds, however, are insufficient to satisfy the United States' first three liens (particularly when penal-

ties and interest are taken into account), let alone any of the Commonwealth's liens. Thus, any concerns over dismissing the Commonwealth as a party—rather than the entire action—are further minimized.

The funds deposited by Horizon in the registry of the Court may thus be disbursed to Giarrusso in the amount of $264,942.00. The remainder of the funds may be disbursed to the United States. Judgment will enter declaring that, upon such disbursements, Horizon shall have no further obligation arising out of this foreclosure sale to any of the interpleader defendants (most relevantly the United States and Giarrusso), other than the Commonwealth. Because this Court has dismissed the Commonwealth as a party to claims involving the nongovernmental parties, nothing herein is in any way binding on it with respect to those parties, except to the extent those parties are able to make use of this Court's holding that the United States has priority over the Commonwealth. The Commonwealth thus remains free to pursue whatever rights it may have in its own courts.

### III. Conclusion

For the reasons stated above, the Commonwealth's Motion To Dismiss [Doc. No. 5] is ALLOWED, but only to the extent that the Commonwealth is dismissed as a party relative to the nongovernmental parties. The Motion To Dismiss is otherwise DENIED. Giarrusso's Motion for Summary Judgment [Doc. No. 20], however, is ALLOWED. The remaining funds are to be disbursed to the United States, as detailed above.

SO ORDERED.